UNITED SERVICES AUTOMOBILE ASSOCIATION, Appellant,

v.

Penny PENNINGTON, Appellee.

No. 04–89–00444–CV.

Court of Appeals of Texas, San Antonio.

April 30, 1991.

Rehearing Denied July 8, 1991.

Thomas Walch, Melvin A. Krenek, Melvin A. Krenek & Associates, San Antonio, Mike A. Hatchell, Ramey, Flock, Jeffus, Crawford, Harper & Collins, Tyler, for appellant.

Phil Watkins, Catherine M. Stone, Watkins & Brock, P.C., San Antonio, for appellee.

Before REEVES, C.J., and BUTTS and PEEPLES, JJ.

## OPINION

REEVES, Chief Justice.

This is an appeal by an insurance company, United Services Automobile Association (USAA), against which a judgment was entered for $327,576.07, plus interest and costs, in favor of its insured's assignee, Penny Pennington.

## FACTS

Gary Lochte purchased a homeowner's insurance policy from USAA in 1985. The policy excluded coverage for damages arising out of "business pursuits." Lochte is a car salesman. He also ran a quarter horse breeding business with his father. Apart from the breeding business, he and Don Rowland, a co-worker at the car lot, purchased a quarter horse, Viking Vanny, in order to experiment with a new training system to condition horses for racing competition. They placed an advertisement in the local newspaper to hire someone to ride

the horse.[1] Penny Pennington answered the advertisement. During her interview with Lochte and Rowland she was asked to demonstrate her riding abilities by riding Viking Vanny. The horse reared while Pennington was mounted on her. Pennington slid off the back of the horse and the horse fell on top of her, crushing her pelvis.

Lochte notified USAA of Pennington's injury. USAA investigated the claim, questioned Lochte regarding his horse breeding pursuits and the status of Viking Vanny as a hobby or business pursuit. It eventually notified him it would not defend him in any lawsuit instituted by Pennington against him because the occurrence was deemed by USAA to come under the business pursuit exclusion. Lochte obtained private counsel to represent him in the suit. The trial court entered a judgment against Lochte and awarded Pennington $277,576.07 actual damages for the injuries she sustained.

Lochte then assigned Pennington his claim against USAA for its failure to defend him in the *Pennington v. Lochte* suit in return for her agreement not to execute on the judgment against him. Pennington brought this suit against USAA for breach of the insurance contract by failing to defend its insured, violating the DTPA, violating article 21.21 of the Insurance Code, and negligence in handling the claim. A jury found that Lochte's enterprise with Viking Vanny was not a business pursuit, thus establishing USAA's responsibility to defend Lochte. The jury also found that USAA was negligent and grossly negligent in its handling of Lochte's claim and that the negligence was a proximate cause of the damages against Lochte. It also found that USAA failed to furnish Lochte a defense, which was a proximate cause of the damages entered against him. The jury further found that USAA failed to disclose to Lochte that a potential conflict may exist between its and his rights prior to taking Lochte's recorded statement, but they failed to find that this constituted a heedless and reckless disregard for his rights. The jury found $25,000 as damages for Lochte's mental anguish, lost wages, and attorney's fees resulting from USAA's failure to defend him and $25,000 as exemplary damages.

## BUSINESS PURSUIT

In its first two points of error, USAA claims that the evidence is factually and legally insufficient to support the jury's finding that the enterprise with Viking Vanny was not a business pursuit, but that the evidence establishes as a matter of law that the ownership of the horse was a business pursuit, and thus USAA had no obligation to defend Lochte.

Neither the insurance policy nor the court's charge defines "business pursuit." This is a case of first impression because no Texas case has defined that term. If the language of the insurance contract is not ambiguous, that is, it is not susceptible to more than one reasonable construction, we must give the words used their plain and ordinary meaning. *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987); *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex.1984).

The term, business, is defined in the policy to include trade, profession, or occupation. The terms, trade, profession, and occupation, are not defined in the contract. Thus, we must give these words their plain and ordinary meaning. A hobby is a specialized pursuit, such as stamp collecting, painting, or gardening, that is outside of a person's regular occupation, usually done in a non-professional way as a means of relaxation during leisure time. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1075 (1981). A trade, profession, or occupation, by contrast, connotes a means of earning a living. A trade is the business practiced or work engaged in regularly for gainful employment—a livelihood. *Id.* at 2421. Occupation is the principal business of one's life—a means of

---

1. The ad read:
   Young lady with a love for horses who wants to learn to become a jockey. All phases of training, will also clean stalls and care for horse in Boerne. Hard work with great rewards. Call Gary Lochte....

earning a living. *Id.* at 1560. And profession is a calling which requires specialized knowledge and training, often in historical, scientific, or scholarly principles, which are fundamental to the skills and methods needed. *Id.* at 1811.

Pursuit is an activity pursued or engaged in seriously and continually or frequently as a vocation or profession. *Id.* at 1848.

Thus, we can see that a hobby is distinguished from a trade, occupation, or profession in that a hobby is not necessarily a continuous or principal undertaking nor does it have as its goal the making of money or the earning of a livelihood.

Other jurisdictions have defined "business pursuits." These definitions fall into three categories:

(1) cases in which business pursuit includes every activity in which profit is a motive (*see* Annotation, *Construction and Application of "Business Pursuits" Exclusion Provision in General Liability Policy,* 48 A.L.R.3d 1096, 1101 (1973));

(2) cases in which business pursuit involves only the insured's own business (*see id.*); and

(3) cases in which business pursuit signifies a continued or regular activity for the purpose of earning a livelihood such as a trade, profession, occupation, or commercial activity (*see id.* at 1100).

█ It is clear that the ordinary definitions of trade, occupation, and profession have a common thread—that is, an activity which is regularly engaged in and the idea that a livelihood or means of earning a living is the motive for undertaking the activity. Thus, we define "business pursuit" as enveloping two elements:

(1) continuity or regularity of the activity, and

(2) a profit motive, usually as a means of livelihood, gainful employment, earning a living, procuring subsistence or financial gain, a commercial transaction or engagement. *See State Mut. Cyclone Ins. Co. v. Abbott,* 52 Mich.App. 103, 216 N.W.2d 606, 608–09 (1974); *Heggen v. Mountain West Farm Bureau Mut. Ins. Co.,* 220 Mont. 398, 715 P.2d 1060, 1062 (1986); *Fadden v. Cambridge Mut. Fire Ins. Co.,* 51 Misc.2d 858, 274 N.Y.S.2d 235, 241 (N.Y.Sup.Ct. 1966), *aff'd,* 27 A.D.2d 487, 280 N.Y.S.2d 209 (N.Y.App.Div.1967); *Wiley v. Travelers Ins. Co.,* 534 P.2d 1293, 1295 (Okla. 1974). The profit need not be realized—the issue is the expectation or anticipation for profit in the future—since often business ventures result in a loss. *See Wiley v. Travelers Ins. Co.,* 534 P.2d at 1295.

USAA complains that there is legally and factually insufficient evidence to support the jury's answer to Question Number 1, which inquired of the jury:

Do you find from a preponderance of the evidence that Gary W. Lochte's ownership of the horse Viking Vandy [sic] on November 10, 1985 was or was not a business pursuit?

ANSWER: "It was a business pursuit." or "It was not a business pursuit."

ANSWER: *It was not a business pursuit.*

USAA urges that the evidence establishes, as a matter of law, that the ownership of the horse was a business pursuit.

█ In considering a "no evidence" or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). In considering a factual sufficiency point, we assess all the evidence and reverse for a new trial only if the challenged finding is factually insufficient or is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (great weight and preponderance); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Gary Lochte testified and maintained throughout the proceedings that from the point of purchase of Viking Vanny until the accident occurred, Viking Vanny was a hobby, separate and distinct from the breeding business he engaged in with his

father. Lochte's father had no ownership interest in the mare: Lochte and Don Rowland were her co-owners. Lochte's occupation is that of a car salesman.

The breeding business Lochte and his father were engaged in was intended to raise top quality horses for racing and selling through genetic selection. Lochte denied that Viking Vanny was ever a part of that business. Viking Vanny was a joint experiment of his and Rowland's "to try out a new type of conditioning method" known as interval training. The purpose was to train a horse to race to its fullest capacity while minimizing injuries commonly occurring due to extensive training.

Until the day of the accident, Lochte had no intention of treating Viking Vanny as a business—she was an experiment. If successful results from the interval training occurred, he and Rowland would buy a lot of horses and train them. If it was unsuccessful, they would sell the mare.

After Pennington was injured, Lochte wanted out of the joint experiment. For a couple of months after the accident, they kept Viking Vanny at the fairgrounds and a jockey worked her. Since he was paying most of the expenses on the mare, Lochte wrote to Rowland in December to complain. Lochte took a horse he thought to be Viking Vanny to a trainer to be trained under conventional training methods. However, it turned out that Rowland had taken Viking Vanny and the mare Lochte delivered to the trainer was someone else's horse. He estimated he had lost up to $5,000 in expenses by then.

Lochte further testified that Viking Vanny became a liability to him after the accident. He no longer pursued the interval training experiment. He felt he had to make some money with the mare somehow. He sold her in 1986.

USAA's investigator questioned Lochte concerning how long "he'd been in the horse business." Lochte testified that his response, that he did not "know that [he is] in the horse business," was based on his

belief that the question related only to the Viking Vanny venture.

On cross-examination, Lochte admitted stating, in his deposition, that he hoped to race the mare and "reap some profit," but they never reached that stage. Lochte's goal was to purchase a horse younger than Viking Vanny and use the interval training if it proved successful with her. He would eventually like this to be a business pursuit, but at the time of the injury it was not.

After the accident, Lochte treated Viking Vanny as a business. On his 1985 federal income tax return, he listed October 16, 1985, as the date he put the mare in service. He claimed depreciation on her that year and the ensuing year. Lochte denied taking any deductions for Viking Vanny for the month between her purchase and Pennington's injury.

Lochte had placed an advertisement in the Hill Country Recorder for a young lady who wished to learn to become a jockey. Her duties would include riding the horse, feeding and grooming her, and cleaning the stables. Pennington answered this advertisement. In his December 19, 1985, statement to the USAA investigator, concerning the advertisement, Lochte stated:

> Also somebody who would gallop the horses for us and somebody of course who had preferably a desire to maybe ride professionally for us as a jockey. That's what we really wanted is somebody who had the expertise with the desire to ride for us if our horses proved to be good enough to put on the track.
>
> . . . .
>
> Q: Okay. You do this just as a hobby?
> A: Yeah. I would like to eventually turn it into a business you know I'm just sort of learning as I go you know trying to learn the ropes and stuff, I have always loved horses just never owned any so just if it turns into a business it would be great if it doesn't at least I'll stop losing money when I quit.[2]

2. The statements are quoted in our opinion as they were transcribed for the trial court—in-

cluding the omission of punctuation.

On January 28, 1986, Lochte gave a second recorded statement to USAA:

Q: Do you consider the ownership of this horse as a business pursuit?

A: Not exactly.

Q: Okay. Um, how would you classify this? Would it be classified as a hobby?

A: Right now it's basically a hobby. If we, the intension [sic] of course, if she if this mare responds like any of the other horses, if they respond to the training program and look like they can be competitive, then we will you know, invest the money for a [sic] entry fee and see what she will do in competition. But if she don't look like it, then we're not gonna do anything with her. But I would like for it to be a business pursuit, but I don't know if it will be at this time. It is too early to tell.

Don Rowland, the co-owner of Viking Vanny, also made a statement to the USAA investigator which was recorded:

Q: Okay, uhh what is the intent for the use of that horse?

A: To uhh race it.

Q: To race it?

A: Yes.

Q: Okay uhh would it be done for money in the future or uhh—

A: Yes.

Robert Lewis, a CPA, testified that deductions are not allowable on the federal income tax return unless they are made in connection with a business activity—one engaged in for profit. By including deductions for Viking Vanny on his income tax returns, Lochte is claiming income is produced by that activity or it is anticipated that income will be produced in the future. Lochte can claim depreciation only for assets that are used in a trade or business.

Lochte's 1985 federal income tax return reveals that he claimed depreciation for Viking Vanny, based on a five-year depreciation schedule. He stated on the return that Viking Vanny was placed in service on October 16, 1985.

■ There is evidence to support the jury's finding that the ownership of Viking Vanny was not a business pursuit.

(1) *Continuity:* Lochte had undertaken the experiment of interval training for a race horse and had been engaged in that activity one month. There is testimony the jury could believe that the ownership of Viking Vanny was separate from Lochte's breeding business with his father. There is no evidence that Lochte ever intended to breed Viking Vanny. Nor is there testimony showing that Lochte's father held any ownership in Viking Vanny. There is no evidence that the undertaking was engaged in with any regularity.

(2) *Profit Motive:* While the evidence may appear to be conflicting on the issue of profit motive, the jury was the final arbiter of facts and heard sufficient evidence upon which it could find that Lochte did not anticipate making a profit.

Lochte's testimony showed he was interested in trying a new theory of horse training. At the time he and Rowland purchased Viking Vanny, his goal was to test this interval training theory. He did testify that if the training program was successful, he would turn it into a business. He hoped that the program would be successful so that it could become profitable. However, this testimony concerned his future plans and indefinite speculations—not what his intention was at the time he purchased the mare and at the time Pennington rode her. The jury was justified in impliedly finding that his present intention and goal were not motivated by profit.

While the fact that Lochte claimed depreciation for Viking Vanny on his federal income tax return from the date he purchased her is some evidence of a profit motive, the jury could believe Lochte's testimony that after the accident he changed his mind about Viking Vanny and no longer desired to pursue his experiment with her as a hobby but decided to try to make money with her.

We find the evidence both legally and factually sufficient to support the jury's finding that the ownership of the horse was not a business pursuit. USAA's points of error one and two are overruled.

## TORT CAUSE OF ACTION

USAA's next eleven points of error require us first to determine whether a tort cause of action exists for an insurer's wrongful refusal or failure to defend its insured. USAA complains that Pennington's tort cause of action for negligent handling of the claim is an inappropriate claim to bring because USAA's wrongful refusal to defend Lochte is a breach of a contractual duty and thus must be brought as a contract claim. Pennington alleged DTPA violations, insurance code violations, breach of contract, and negligence in USAA's handling of the claim.[3] The jury found that USAA was negligent in the manner in which it handled Lochte's claim, was grossly negligent, and that the negligence was a proximate cause of the damages against Lochte. The jury also found that USAA failed to furnish Lochte a defense and the failure to do so was a proximate cause of the damages entered against him. The trial court entered judgment against USAA for the full amount of the *Pennington v. Lochte* judgment, an amount exceeding the limits of Lochte's insurance policy.

■ A claim sounding in tort for the insurer's breach of the duty of good faith and fair dealing has been recognized. *Viles v. Security Nat'l Ins. Co.,* 788 S.W.2d 566, 567 (Tex.1990); *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987). Under this cause of action, the claimant must show that there was no reasonable basis for the insurer's denial of the claim, its delay in payment of the claim, or its failure to determine the claim. *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d at 167. Pennington did not plead, prove, or request jury questions on this cause of action and therefore it has been waived.

Pennington neither pleaded nor proved a *Stowers*[4] claim—that USAA negligently failed to accept an offer of settlement within the policy limits. No offer of settlement had been tendered.

No Texas case has found or discussed a cause of action such as Pennington has alleged, i.e., the insurer's negligent handling of the claim by wrongfully refusing to defend its insured. The supreme court has approved a jury issue concerning the negligent handling of a claim in *Ranger County Mut. Ins. Co. v. Guin,* 723 S.W.2d 656 (Tex.1987). However, in that case, the instruction accompanying the jury question directed the jury to a consideration of a *Stowers* claim—that the insurer negligently handled the claim by failing to settle within the policy limits and by failing to communicate an offer of settlement to its insured. Such is not the case before us.

■ In order for a tort duty to arise out of a contractual duty, i.e. a negligent failure to perform a contract, the liability must arise "independent of the fact that a contract exists between the parties": the defendant must breach a duty imposed by law rather than by the contract. *Southwestern Bell Tel. Co. v. Delanney,* 809 S.W.2d 493, 494 (1991). If the defendant's conduct would impose liability on him only because it breaches the parties' agreement, the claim is contractual. *Id.* The supreme court also looked to the nature of the plaintiff's loss in determining whether the claim sounded in contract or tort. "When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract." *Id.* Economic loss to the subject matter of the contract does not give rise to tort liability. *Id.* In our case, no liability arises in the absence of a contract (the insurance policy). Without the policy, USAA had no insured and no duty to defend. No legal duty of adhering to the contract terms has been imposed by law. Thus, there is no duty beyond the contract itself to defend the insured. The law, however, has imposed the duty that the insurer act in good faith and deal fairly with the insured, *Viles v. Security Nat'l*

**3.** Pennington abandoned the DTPA claim prior to submission of the case to the jury. The jury found in favor of USAA on the insurance code violations claim and Pennington does not complain of the jury's findings on that issue.

**4.** *G.A. Stowers Furniture Co. v. American Indem. Co.,* 15 S.W.2d 544 (Tex.Comm'n App.1929, holding approved).

*Ins. Co.,* 788 S.W.2d at 567; *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d at 167, and to exercise ordinary care and prudence in considering an offer of settlement within the policy limits. *G.A. Stowers Furniture Co. v. American Indem. Co.,* 15 S.W.2d 544, 548 (Tex.Comm'n App.1929, holding approved). In the absence of pleadings and proof that USAA failed to act in good faith and to deal fairly with Lochte or that it negligently failed to accept a settlement, no tort liability arises. Thus, we reverse the judgment of the trial court insofar as it awards Pennington judgment on a tort basis.

## EXCEST LIABILITY

The trial court awarded Pennington $277,576.07—the full amount of the judgment she was awarded in the personal injury suit. USAA complains that the trial court erred in awarding her damages in excess of the policy limits. Since Pennington did allege and prove that USAA breached its contract with its insured by failing to defend him in the *Pennington v. Lochte* suit, she is entitled to recover damages. However, damages in a contract claim for the wrongful failure to defend do not include damages in excess of the policy limits. *Employers Nat'l Ins. Corp. v. Zurich American Ins. Co.,* 792 F.2d 517, 520 (5th Cir.1986); *Whatley v. City of Dallas,* 758 S.W.2d 301, 307 (Tex.App.—Dallas 1988, writ denied); *Texas United Ins. Co. v. Burt Ford Enters., Inc.,* 703 S.W.2d 828, 835 (Tex.App.—Tyler 1986, no writ). This is true at least when there has been no showing "that the claim could have been resolved for the policy limits." *Employers Nat'l Ins. Corp. v. Zurich American Ins. Co.,* 792 F.2d at 520. Thus, "like any breach of contract, [the insurer's wrongful refusal to defend its insured] may give rise to liability for all damages directly and foreseeably resulting from the breach." *Whatley v. City of Dallas,* 758 S.W.2d at 309. In the absence of a showing either that the claim could have been resolved for the policy limits (*Employers Nat'l Ins. Corp. v. Zurich American Ins. Co.,* 792 F.2d at 520) or that the insurer breached its duty of good faith and fair dealing (*id.; Whatley v. City of Dallas,* 758 S.W.2d at 309), the insured's damages generally will be limited to the policy limits [5], expenses of the insured in defending the suit (including reasonable attorney fees and court costs), and reasonable and necessary attorney fees and costs incurred in the suit to enforce the judgment against the insurer. *Texas United Ins. Co. v. Burt Ford Enters., Inc.,* 703 S.W.2d at 835.

We reverse that part of the judgment which awards Pennington an amount in excess of the policy limits.

## MENTAL ANGUISH, LOST WAGES, EXEMPLARY DAMAGES, JURY INSTRUCTIONS, AND ATTORNEY'S FEES

USAA complains of the $25,000 award for mental anguish, lost wages, and attorney's fees (Question No. 10), as well as the $25,000 award as exemplary damages (Question No. 3). It also raises a complaint about the submission of a jury instruction concerning USAA's duty to defend. We need not address these issues because we have found that Pennington is not entitled to recover under her tort theory. Therefore, all tort damages must fall (*see Myrtle Springs Reverted Indep. School Dist. v. Hogan,* 705 S.W.2d 707, 710 (Tex.App.—Texarkana 1985, writ ref'd n.r.e.), *cert. denied,* 480 U.S. 906, 107 S.Ct. 1350, 94 L.Ed.2d 520 (1987)). The instruction, which pertains to the tort cause of action, need not be considered.

Question No. 10 also inquired about damages for attorney's fees resulting from USAA's failure to defend Lochte. We are unable to determine what amount of the $25,000 damages found by the jury is attributable to attorney's fees. The evidence

---

5. Plaintiff's Exhibit 6, the insurance policy, was admitted into evidence. The policy shows $100,000.00 coverage per occurrence for personal injury and $1,000.00 coverage per person for personal medical payments. In its appellate brief, USAA stipulates that it "is not, by this appeal, attempting to avoid its contractual liability to pay its policy limits and reimburse litigation expenses *if* there was coverage for the Pennington claim."

showed that Lochte incurred attorney fees of either $2,000 or $2,500, but there was no testimony that either amount was reasonable or necessary. Because we are unable to segregate the damages in Question No. 10, we must reverse the judgment of the trial court which awards attorney fees and remand the cause to the trial court for a new trial to determine the amount of reasonable and necessary attorney fees incurred in defense of the *Pennington v. Lochte* suit.[6] *See Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401–02 (Tex. 1981).

### CONCLUSION

The judgment is affirmed as to the award of damages up to the limits of the insurance policy. The judgment of the trial court is reversed insofar as it awarded damages for an amount in excess of the policy limits, for mental anguish, lost wages, and punitive damages, and on those aspects of the case a take nothing judgment is rendered. The judgment is reversed insofar as it awards attorney fees and the cause is remanded for new trial to determine reasonable attorney fees incurred in defending the *Pennington v. Lochte* suit.

---

**6.** No evidence was offered and no jury question was requested or submitted concerning reasonable and necessary attorney fees and costs incurred in the suit to enforce the judgment against the insurer (the instant suit). No complaint is raised that no award for this element of damages was made.