ST. PAUL SURPLUS LINES INS. CO., INC., Appellant,

v.

DAL–WORTH TANK CO., INC. and Mission Butane Gas Co., Appellees.

No. 07–93–0197–CV.

Court of Appeals of Texas, Amarillo.

Aug. 29, 1995.

Opinion Overruling Rehearing Dec. 28, 1995.

Rehearing Overruled Jan. 23, 1996.

Cooper & Huddleston P.C., R. Brent Cooper, Michael W. Huddleston, Michelle E. Robberson, Dana Harbin, and Scott A. Whisler, Dallas, Davidson & Troilo, Terry Topham and Mary Mishtal, San Antonio, for appellant.

Watkins & Brock P.C., Phil Watkins and Suzette Kinder, San Antonio, Pozza & Patton, Timothy Patton, San Antonio, Gary Crapster, Dallas, for appellees.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

Complaining of the existence of a Mary Carter agreement, lack of or insufficient evidence to support the judgment rendered against it, and errors in the award of damages, St. Paul Surplus Lines Insurance Co., Inc. (St. Paul) presents fifty-six points of error[1] to appeal from the judgment in favor of Dal–Worth Tank Co., Inc. (Dal–Worth)[2] and Mission Butane Gas Co. (Mission Butane). Dal–Worth counters with a cross-point, asserting its entitlement to exemplary damages and attorney's fees. Based upon the authorities cited and the rationale expressed, we will reverse the judgment only to the extent that it permits recovery of future lost profits as well as treble damages and, because the change in the amount of recovery necessitates a recomputation of prejudgment interest and attorney's fees, remand the cause to the trial court in order that the damages, interest and fees may be computed in conformity with the applicable principles.

Because of the number of points and the cross-point, and St. Paul's contentions of evidential insufficiency, our address is necessarily lengthy. At the outset, we will outline the facts and circumstances leading to this appeal, and notice other pertinent facts in our discussion of specific contentions of error.

## EVENTS LEADING TO THE LITIGATION

Fifty years ago, Dal–Worth began operations in Grand Prairie as a designer and fabricator of propane tanks and vessels. For a time, it was the only business in Texas designing and fabricating a liquid propane (LP) gas pressure vessel, and it also fabricated a custom-design line of tanks throughout the country and overseas.

During the years 1983 and 1984, Mission Butane purchased three vehicles from Dal–Worth's LP line. These vehicles were assembled by Dal–Worth from a Chevrolet truck chassis purchased from General Motors Corporation, together with valves, meters and other accessories purchased from various suppliers, and a liquid propane tank fabricated by Dal–Worth.

In 1987, Ed Talbot, acting in his capacity as secretary and treasurer of Dal–Worth, requested James Lawrence of the Lawrence & Wright Agency (collectively referred to as Lawrence unless otherwise indicated), to obtain bids for product liability and completed operations insurance. Lawrence contacted Surry George Shaffer, III of the Shaffer

---

1. Although the points of error indexed by St. Paul number only fifty-four, in the text of the brief the numbers thirty and thirty-one are duplicated and points of error not listed in the index are presented, bringing the number of points of error alleged by St. Paul for our determination to fifty-six.

2. After the events giving rise to this litigation, Dal–Worth Tank Co., Inc. ceased to be a going operation on 31 March 1992, and on 1 April 1992, Dal–Worth Fabrication began operating as a custom line fabricator. References herein to Dal–Worth are to Dal–Worth Tank Co., Inc., and its interests.

Insurance Agency, Inc. (collectively referred to as Shaffer unless otherwise indicated), to assist him since Shaffer was more experienced in such matters.

On 10 May 1987, Dal–Worth purchased an insurance policy from St. Paul through the efforts of Lawrence, Shaffer, and Skeels, Mullens & Associates, Inc. d/b/a Felts, Mullens & Fuos (collectively, Skeels), as the surplus lines broker for St. Paul, because St. Paul was not authorized to do business in Texas. The policy provided comprehensive coverage for products and completed work liability, with an aggregate limit of $1,000,-000.00. The following month, one of the trucks purchased by Mission Butane rolled over in a single vehicle accident.

In March of 1988, Dal–Worth purchased a three-year extended reporting endorsement on its initial policy, and a second liability policy (collectively, the policies). All of Dal–Worth's transactions were conducted through Lawrence and Shaffer, who delivered the policies to Talbot. During this same time frame, another truck purchased by Mission Butane rolled over and, on 27 June 1988, a third truck rolled over in San Antonio, injuring the driver, Bobby Flores.

In September of 1988, Dal–Worth received notice from Mission Butane's insurer, Ranger Insurance Company, that it intended to pursue a subrogation claim for property damage arising out of the Flores accident, and requesting Dal–Worth notify its insurance carrier of a possible design defect claim. Talbot testified that he followed the same procedure he followed in past lawsuits of giving the letter to Lawrence, who gave it to Shaffer, who gave it to Skeels, who forwarded it to St. Paul. Skeels forwarded the letter to St. Paul with a notation that the correspondence was provided by "our agent," and asked St. Paul to set up a claim file.

On 19 October 1988, John M. Killian, acting as Mission Butane's attorney, sent a thirty-day demand letter pursuant to the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA),[3] to Dal–Worth, General Motors Corporation, and Mission Chevrolet, the San Antonio Chevrolet dealership which

serviced the truck since its purchase from Dal–Worth until the time of the accident. Upon receipt of this letter on 22 October 1988, Talbot followed his customary practice, and gave it to Lawrence. It is undisputed that Lawrence forwarded the letter through the channels outlined above, and it was received on 25 October 1988 by St. Paul's Specialty Underwriting department in its corporate headquarters in Minnesota.

St. Paul's San Antonio office, which had responsibility for the claim because the Flores accident happened in San Antonio, received the demand letter twenty-two days after it was originally received by St. Paul, but still six days prior to the deadline for responding to the demand. St. Paul opened a claim file, assigned Beatrice Asfeld as the claim representative, and set reserves of $10,000 on the claim. Asfeld had exclusive responsibility for handling the claim, originally under the supervision of W.D. "Scotty" Scott, and later his replacement, Jack Larsen. It is undisputed that no action was taken to respond to the demand letter, nor to contact Killian for an extension of time in which to respond.

An 8 December 1988 telephone call was the only conversation Asfeld had with Killian concerning the claim or lawsuit. Killian offered to arrange an inspection of the trucks, but Asfeld declined. Killian informed Asfeld he would be filing suit in the near future because the statute of limitations was about to expire.

Immediately following her conversation with Killian, Asfeld spoke with Talbot, but admittedly failed to tell him of Killian's stated intent to file suit in the near future. Her memorandum memorializing the conversation recites that Talbot forwarded the Mission demand letter to his insurance agent "through proper channels" to St. Paul. Talbot testified that Asfeld told him to keep sending material and correspondence related to the claim through the agents, and did not give him any special instructions for forwarding papers in the event a lawsuit was filed.

On 2 February 1989, Mission Butane filed suit in San Antonio against Dal–Worth, Gen-

3. Tex.Bus. & Com.Code Ann. § 17.41 *et seq.* (Vernon 1987 and Supp.1995).

eral Motors Corporation, and Mission Chevrolet, alleging violations of the DTPA, breach of warranty, unconscionability, and misrepresentation, and seeking an unspecified amount of damages. Mission Butane's DTPA cause of action alleged knowing violations by Dal–Worth, but did not specifically allege its intentional conduct. The Mission Butane suit was not connected to the injuries sustained by Flores, who filed a separate cause of action for that recovery.

Dal–Worth was served with notice of the Mission Butane suit on 22 February 1989, and Talbot delivered the suit papers to Lawrence either that same day, or the following day. It is undisputed that Lawrence sent the papers to Shaffer, but there is disagreement between the parties as to what happened once Shaffer received the papers.

Amy Spross, a former employee of Shaffer responsible for handling claim and lawsuit papers, testified that she mailed the papers directly to St. Paul, as she had done on previous occasions, without going through Skeels. No documentation of the mailing of the papers was presented, and St. Paul denied receiving them.

On 2 March 1989, Asfeld memorialized her conversation with Dora Sarcozy of Ranger Insurance, recording that Sarcozy stated she believed suit had been filed against Dal–Worth in connection with the Mission Butane claim. Asfeld did not investigate the verity of Sarcozy's statement. Rather, on 9 March 1989, she spoke to another Ranger Employee, Barbara Bayer, who stated she "doubted" Ranger would have filed suit because of a probable arbitration agreement with St. Paul. Despite Killian's letter notification and telephone confirmation that suit would be filed, Asfeld chose to believe no suit had been filed by Ranger or anyone else; she assumed that because its insurance company agreed not to file suit, Mission Butane would not file suit in its own right and Flores would not file suit.

Talbot received information from Shaffer that St. Paul intended to answer the Mission lawsuit. Several days later, Talbot spoke to Asfeld and specifically asked about the status of the "suit," to which Asfeld replied that St. Paul was investigating it.

Dal–Worth's answer in the Mission Butane lawsuit was due on 20 March 1989. No answer was filed by, or on behalf of, Dal–Worth.[4] On 27 September 1989, Mission Butane took a default judgment against Dal–Worth, by which Mission Butane was awarded $794,100 in damages, plus an award for attorney's fees. The default judgment recited findings of knowing violations of the DTPA, but no intentional conduct.

Notice of the default judgment, albeit perhaps deficient under the rules of civil procedure, was sent to Dal–Worth. Talbot was not aware of the notice for some time.

In a matter unrelated to the Mission Butane suit, Dal–Worth's corporate counsel, Frank Hagle, pursuant to notice of Mission Chevrolet's cross-action against Dal–Worth in Flores's personal injury suit, wrote Asfeld on 14 December 1989, stating he was forwarding the cross-action to her because he was unaware of any counsel hired by St. Paul to represent Dal–Worth in the Flores lawsuit. Upon receipt of Hagle's letter, Asfeld, unaware of any lawsuit filed against Dal–Worth, asked Ann Megee, an attorney with the San Antonio law firm of Thornton, Summers, Biechlin, Dunham & Brown, to check the files at the county courthouse for any lawsuits filed in connection with the Mission Butane truck rollover.

Megee's search uncovered the default judgment taken by Mission Butane against Dal–Worth. Then, Asfeld discussed with attorneys at Thornton, Summers the possibility of having the default judgment set aside, but no action was taken to do so.

Larsen instructed Asfeld to send her complete file on the Mission Butane claim to Terry Topham, an attorney with the San Antonio office of Davidson, Troilo & Booth, so the firm could provide an opinion regarding whether the claims in the default judgment were covered by the policies. St. Paul decided no action would be taken to set aside the default judgment until the question of coverage was determined, and no attorney was contacted in connection with Dal–

---

4. General Motors Corporation and Mission Chevrolet timely filed answers to the lawsuit.

Worth's interests. The following day, Asfeld informed Talbot of the default judgment, but did not tell him that there were any concerns or questions regarding coverage, or that an attorney's opinion had been requested, or that St. Paul had decided to defer action on the default judgment until the question of coverage was determined, or that no attorney was contacted in relation to Dal-Worth's interests.

The coverage opinion was not completed until 3 January 1990. Even after St. Paul received the attorney's opinion, Larsen determined not to inform Dal-Worth until 10 January 1990 that St. Paul would deny coverage.

St. Paul offered a courtesy defense to Dal-Worth in the Flores case, provided terms and conditions could be agreed upon by Dal-Worth and St. Paul, but St. Paul advised Dal-Worth to consult with its own attorneys concerning the setting aside of the default judgment. Dal-Worth hired attorneys and began the process to appeal the default judgment by writ of error in the San Antonio Court of Appeals.

On 28 February 1990, deputy sheriffs attempted to execute the writ from the default judgment on Dal-Worth's property. When St. Paul refused to post a supersedeas bond to prevent the execution, Dal-Worth filed a petition for bankruptcy. Later, due to a lack of cash flow sufficient to pay worker's compensation insurance premiums, Dal-Worth made a decision to discontinue its LP line and, eventually, Dal-Worth ceased operations completely.[5]

## THE LITIGATION

To determine whether there was coverage for the Mission Butane claim and subsequent lawsuit, St. Paul filed a declaratory judgment action against Dal-Worth in Bexar County. However, St. Paul dismissed that action and intervened for the same purpose in the instant lawsuit filed in Dallas County by Dal-Worth. As originally cast by Dal-Worth, its lawsuit was against only Skeels and Shaffer, who were alleged to have failed to exercise ordinary care in forwarding the Mission Butane lawsuit papers to St. Paul.

By its live trial pleadings, its twelfth amended petition, Dal-Worth complained only of St. Paul and Shaffer as defendants, effectively dismissing its action against Skeels. *Ridley v. McCallum*, 139 Tex. 540, 163 S.W.2d 833, 836 (1942). Although the record is not clear as to how or when Lawrence was brought into the action, it is clear from the recorded dismissals that Lawrence's interests were sufficiently disposed of, and Lawrence it is not a party to the judgment or this appeal.

On 12 November 1990, Dal-Worth and Mission Butane agreed Dal-Worth would dismiss its appeal of the default judgment and Mission Butane would accept, in satisfaction of its judgment, $500,000 in cash, a $25,000 credit of merchandise if used within one year, and a partial assignment of Dal-Worth's cause of action against St. Paul. Mission Butane and Dal-Worth agreed that any recovery on the good faith and fair dealing claim would be divided with Mission Butane receiving 90% and Dal-Worth 10% of any recovery up to $2,000,000, and any remaining recovery would be allocated evenly between the two companies.

On 27 August 1991, Shaffer entered into an agreement to settle its controversy with Dal-Worth and Mission Butane for $498,895.50, which was to be reimbursed if the action against St. Paul was successful (the Mary Carter agreement). Shaffer was dismissed from the lawsuit as agreed in the settlement; but, St. Paul, believing Shaffer to be the "true wrongdoer," brought Shaffer back into the suit through a third party action, ostensibly for the purpose of indemnity, and Shaffer participated in that capacity at trial.[6]

---

5. Dal-Worth's former custom line business is operated by a new family company, Dal-Worth Fabrications, which does not have, and never will have, an LP gas line business.

6. The judgment appealed from recites it is against St. Paul only, and does not recite recovery for or against Shaffer as a defendant. Pursuant to the agreement providing for recoupment of the amounts Shaffer paid upon a successful recovery from St. Paul, Shaffer appeared on appeal by its brief and oral argument on behalf of appellees Dal-Worth and Mission Butane, and in its own behalf in defense of the nonliability findings by the jury.

## JURY'S VERDICT

The trial began on 14 October 1992, and ended four weeks later. After receiving the voluminous evidence presented, the jury found, in response to the numbered questions and as pertinent to this appeal, that St. Paul, in essence,

Q. 3–4 was estopped from denying coverage, and waived its right to assert there was no coverage under the policies of insurance;

Q. 4.1 had actual knowledge of the existence of Mission Butane's lawsuit prior to the date of the default judgment;

Q. 4.2–4.3 was negligent and breached its duty of good faith and fair dealing in failing to investigate whether suit had been filed, which negligence was the proximate cause of the entry of the default judgment;

Q. 5 was negligent in handling the Mission Butane lawsuit which was the proximate cause of damages to Dal–Worth;

Q. 6 breached its duty of good faith and fair dealing;

Q. 7, 9–10 engaged in unfair or deceptive acts or practices and an unconscionable action or course of action, which proximately caused damages to Dal–Worth;

Q. 8 engaged in an unconscionable action or course of action which was a producing cause of damages to Dal–Worth;

Q. 11 could have settled the default judgment for $17,000 before 27 December 1989;

Q. 18 had an agency relationship with Shaffer;

Q. 19 was not prejudiced by Dal–Worth's failure to send the lawsuit papers; and

Q. 20–21 received the lawsuit papers prior to the default judgment.

The jury failed to find, in essence, that

Q. 1–2 the statutorily required language was on the policies delivered to Dal–Worth;

Q. 22–23 Shaffer failed to forward the Mission Butane lawsuit papers to St. Paul,

or that any such failure was a proximate cause of damages to Dal–Worth; and

Q. 24–25 Dal–Worth's failure to follow-up with St. Paul concerning the receipt of the papers or its failure to notify St. Paul of the default judgment was negligent.

The jury, answering question 26, allotted 100% of the negligence which caused Dal–Worth's damages to St. Paul and none to Shaffer and Dal–Worth. Based upon their findings, the jury awarded Dal–Worth (Q. 12) $331,750 for past lost business profits; $2,160,000 for loss of future business profits; $25,000 for attorney's fees related to the bankruptcy and the San Antonio lawsuit; $507,000 for increased business costs; and $500,000 for damage to its credit reputation.

Finding St. Paul's conduct to be (Q. 13) committed knowingly, the jury awarded Dal–Worth (Q. 14) $2,000,000 in additional damages. Because St. Paul's actions were found to be (Q. 15) grossly negligent, the jury awarded Dal–Worth (Q. 16) $11,500,000 in exemplary damages. They further awarded Dal–Worth's counsel (Q. 17) 40% of Dal–Worth's recovery as a reasonable fee for his services.

## JUDGMENT

Faced with the election of recovery under the DTPA, the Texas Insurance Code, or the common law, Mission Butane and Dal–Worth elected to recover under the Insurance Code. The trial court rendered judgment decreeing recovery of $3,523,750 as actual damages; $1,117,219.30 under the default judgment with interest; $607,921.49 as pre-judgment interest on the actual damages; $10,497,781 as additional damages under the Insurance Code; and $10,497,781 as attorney's fees [7]. By virtue of the election, exemplary damages were not awarded.

## THE APPEALS

Appealing from the judgment, St. Paul alleges errors in (1) the existence of a Mary Carter agreement between Shaffer and Dal–Worth; (2–4) the trial court's rulings con-

---

7. We note, although Mission Butane and Dal–Worth do not complain, that the judgment recites an aggregate recovery of $26,244,352.79, but accurately calculated, the aggregate sum is $26,244,452.79.

cerning coverage and St. Paul's duty to defend; the lack of or insufficient evidence to support (5–41) the jury's findings on elements of Dal–Worth's causes of action, and (42–49, 51–52) the awards of damages and attorney's fees; (50) the submission of an improper definition of net profits; (53) the trial court's award of pre-judgment interest; and (54) the trial court's failure to grant St. Paul a credit for the settlement with Shaffer. Dal–Worth presents a single cross-point, asserting it is entitled to both exemplary damages and attorney's fees as cumulative remedies. With a few exceptions, all contentions of error are discussed in the order presented.

### MARY CARTER AGREEMENT

Initially contending the trial court erred in overruling its motion for new trial because the Mary Carter agreement resulted in a materially unfair trial, St. Paul submits that under the holding of *Elbaor v. Smith*, 845 S.W.2d 240 (Tex.1992), the agreement should have been declared void as a matter of law. Dal–Worth and Shaffer respond that *Elbaor* does not control in this instance because the agreement was not the type contemplated by the Court's definition, St. Paul has failed to preserve the error complained of, and St. Paul invited the error, if any.

■ In general, a Mary Carter agreement is a means by which one of a multiplicity of defendants can settle its portion of liability, and limit exposure to an agreed upon amount of damages with a promise of reimbursement if the plaintiff's action against the remaining defendant(s) is successful. In *Elbaor*, our Supreme Court was called upon to determine whether such agreements are "void as contrary to public policy." *Id.* at 241.

At common law, such agreements were prohibited as maintenance and champerty, *Lum v. Stinnett*, 87 Nev. 402, 488 P.2d 347, 350 (1971), because "they are inimical to the adversary system, and do not promote settlement." *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 8 (Tex.1986) (Spears, J. concurring). Nevertheless, in the early 1970's, Mary Carter agreements became prevalent with the advent of *Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla.App.1967), overruled by, *Ward v. Ochoa*, 284 So.2d 385 (Fla.1973), the case from which such agreements acquired their name. As Mary Carter agreements became more common, their impact upon the fairness of trial outcomes created a quagmire of admissibility and harm analysis questions.

Determining Mary Carter agreements create a "tremendous incentive for the settling defendant to ensure that the plaintiff succeeds in obtaining a sizable recovery, and thus motivates the defendant to assist greatly in the plaintiff's presentation of the case," the *Elbaor* Court declared such agreements "void as violative of sound public policy." 845 S.W.2d at 247, 250. St. Paul contends *Elbaor* requires the reversal of the trial court's decision and a remand for a new trial as a matter of law.

Our consideration of St. Paul's contention is by a triadic analysis. First, we must determine whether the *Elbaor* holding is applicable to the present situation; if so, whether the complaint of error was preserved; and if so, whether the error was harmful to St. Paul in that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Tex. R.App.P. 81(b).[8] The first two determinations require affirmative answers, but the third determination results in a negative answer.

■ The threshold determination to be made is whether the settlement agreement between Dal–Worth and Shaffer was in fact a Mary Carter agreement. En route to its decision, the *Elbaor* Court clarified that, for purposes of that opinion, a Mary Carter agreement existed "when the settling defendant retains a financial stake in the plaintiff's recovery *and* remains a party at the trial of the case." 845 S.W.2d at 247 (emphasis in original). Dal–Worth and Shaffer contend that since Shaffer, the settling defendant, was required to be, and was, dismissed as a party under the agreement, and was brought

---

8. Unless otherwise indicated, references herein to rules are to Texas Rules of Appellate Procedure.

back only as an unwilling third-party defendant, the requirement of remaining a party was not met and, thus, the agreement was not a Mary Carter agreement as defined in *Elbaor*. They further contend that Shaffer was not a necessary party and, therefore, St. Paul invited any error by forcing Shaffer back into the litigation. However, the parties point to, and our search has revealed, nothing in the record to reflect an objection that Shaffer was not a necessary party was made at trial; hence, that objection is waived. Tex.R.App.P. 52(a) and 74(d).

We recognize Shaffer's and Dal–Worth's concerns are similar to those expressed by the dissent in *Elbaor*, *i.e.*, that the ruling locks the door to participation, and inhibits the ability of those called into court to be allowed to answer. 845 S.W.2d at 253. However, in defining a Mary Carter agreement to include participation at trial by the settling defendant, the majority determined the participation requirement is satisfied by the mere presence of the settling defendant as a party in the case, *id.* at 247 n. 14, without qualification as to how or why he remains a party at the time of trial. We are bound by the opinion of the majority. *Swilley v. McCain*, 374 S.W.2d 871, 875 (Tex. 1964).

Regardless of how or why Shaffer remained at the time of trial, his mere presence as a party brought the agreement within the *Elbaor* definition of a Mary Carter agreement. This determination is supported by the dicta in *Elbaor*, and Justice Spears's concurrence in *Scurlock*, that the true danger of Mary Carter agreements is the possibility that the parties' alignment will somehow be skewed, 845 S.W.2d at 246, and the non-settling defendant's due process right to a fair trial will be threatened, 724 S.W.2d at 9 (Spears, J. concurring), and the trial court's efforts in the present instance to ensure a fair trial.

Shaffer's counsel was allotted a substantially shorter amount of time to conduct voir dire and cross-examination of witnesses, and all parties made full disclosure to the jury of the existence, and terms, of the agreement. St. Paul's counsel explained to the jury that "Shaffer is in it to help and assist the plaintiff in proving its claim against St. Paul," thereby overcoming the likelihood that the plaintiff and settling defendant would unfairly "gang up" on the non-settling defendant without the jury's knowledge. *Accord Scurlock Oil Co. v. Smithwick*, 724 S.W.2d at 7.

■ There was no objection made that the agreement was not a Mary Carter agreement until this appeal; resultantly, it is an untimely objection. Tex.R.App.P. 52(a). Moreover, the terms of the agreement are consistent with other established Mary Carter agreements, clothing it with the indicia of a true Mary Carter agreement. *General Motors Corp. v. Simmons*, 558 S.W.2d 855, 857–58 (Tex.1977), *overruled on other grounds, Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 427 (Tex.1984); *Mi–Jack Products, Inc. v. Braneff*, 827 S.W.2d 493, 497 (Tex.App.—Houston [1st Dist.] 1992, no writ). Beyond that, throughout the trial the parties and the court consistently referred to, and treated, the agreement as a Mary Carter agreement. If there is any doubt as to the meaning of a document, the courts may consider the interpretation placed upon it by the parties themselves. *Lone Star Gas Co. v. X–Ray Gas Co.*, 139 Tex. 546, 164 S.W.2d 504, 508 (Tex. 1942). The settlement agreement was indeed a Mary Carter agreement.

The next determination is the applicability of the *Elbaor* holding, rendered on 2 December 1992, to this cause, which was tried on 14 October 1992, and in which the jury rendered its verdict on 12 November 1992, but judgment was not signed until 31 March 1993. St. Paul contends that because *Elbaor* was decided prior to judgment, the holding should be retroactively applied. Dal–Worth contends the entry of the jury's verdict brought the matter to completion prior to the *Elbaor* decision.

■ The guiding principle in precluding full retroactivity turns on whether the decision establishes a new principle of law that either overrules clear, past precedent on which the litigants have relied, or decides a new issue of first impression that was not clearly foreseeable. *Reagan v. Vaughn*, 804 S.W.2d 463, 467–68 (Tex.1990). However, exceptions are recognized when consider-

ations of fairness and policy dictate prospective effect only, a notable one of which is where a retroactive application could be unfair because litigants and trial courts have justifiably relied upon the prior state of the law. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 434 (Tex.1984).

After some discussion, the *Elbaor* Court concluded that the factors weighing in favor of a prospective application of its holding outweighed that in favor of retroactive application, and declared

> as a matter of sound administration and fairness, that this holding shall be applicable only in the present case, to those cases in the judicial pipeline where error has been preserved, and to those actions tried on or after December 2, 1992.

*Elbaor v. Smith*, 845 S.W.2d at 251. Clearly, the only possible route through which St. Paul contends for applicability is that the case was "in the judicial pipeline where error has been preserved."

The *Elbaor* Court did not define the term "judicial pipeline," and the parties disagree as to its meaning when applied to this cause. Dal–Worth contends the present case was not in the judicial pipeline because it was brought to conclusion with the jury's verdict, and the judicial pipeline refers only to cases already on appeal at the time of the decision. St. Paul contends it was in the judicial pipeline because judgment was not signed until 31 March 1993, a time after the *Elbaor* decision was handed down, leaving the trial court a window of opportunity to grant a motion for new trial based upon the decision.

■ We note that the judgment was not final with the jury's verdict since judgment is not final until it is rendered and entered of record. *See Kostura v. Kostura*, 469 S.W.2d 196, 198 (Tex.Civ.App.—Dallas 1971, writ ref'd n.r.e.). An action remains pending in the trial court until all issues have been determined by the court, a final judgment has been rendered, and all post-trial motions have been disposed of. *Tuthill v. Southwestern Public Service Co.*, 614 S.W.2d 205, 211 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r.e.).

■ The phrase, "still in the judicial process" has been defined to include cases which are filed, *Sample v. Freeman*, 873 S.W.2d 470, 476 (Tex.App.—Beaumont 1994, writ denied), and those which have been tried to conclusion and are on appeal on the date of the decision in question. *Taggart v. Taggart*, 552 S.W.2d 422, 423 (Tex.1977). Thus, a case is "still in the judicial process" from the time it is filed until the time mandate issues. We conclude that "judicial process" and "judicial pipeline" are synonymous; therefore, *Elbaor* impacts our consideration of St. Paul's contention of error.

Given that this cause was within the time frame contemplated by *Elbaor*, we must decide whether St. Paul preserved its complaint of error. Dal–Worth and Shaffer contend it has not, because no complaint was made against the Mary Carter agreement until after the verdict, as opposed to the situation in *Elbaor*, and because St. Paul introduced the agreement into evidence at trial and cannot be allowed to invite error.

■ However, St. Paul objected to the Mary Carter agreement as being void during the hearing on Dal–Worth's motion for judgment. This was St. Paul's first opportunity to present such an objection since *Elbaor* was decided only after the jury's verdict. At every subsequent opportunity, St. Paul urged its contention of error.

Insofar as St. Paul's failure to object to the agreement's existence and introduction at trial, the parties were operating under a different state of the law. Although Justice Spears was prepared to hold Mary Carter agreements void as against public policy in 1986, *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d at 8, it was another six years before the Supreme Court did so hold. *Elbaor v. Smith*, 845 S.W.2d at 250. The present cause was tried in those intervening years when such agreements were not void, but precautions to minimize their dangers were encouraged to be taken, and it was encouraged to disclose such agreements to the jury. Although Dal–Worth faults St. Paul for failing to preserve error as did the defendant in *Elbaor*, we do not believe this is the contemplation of the holding.

Because St. Paul was operating under the state of law as it existed prior to *Elbaor*, it cannot be faulted with a failure to object during trial that the agreement was void. St. Paul did all it was expected to do under *Scurlock*, and was entitled to proceed with the only explanations then available. *Accord Duncan v. Cessna Aircraft Co.*, 665 S.W.2d at 434.

■ Notwithstanding having prevailed on the determinations that *Elbaor* is applicable to this cause and that it properly preserved its complaint against the Mary Carter agreement, St. Paul is not relieved of the appellate requirement of establishing that the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Elbaor v. Smith*, 845 S.W.2d at 251 n. 23. We must determine whether the error complained of was harmful. Tex. R.App.P. 81(b).

St. Paul contends the Mary Carter agreement is, in and of itself, harmful because of the inherent ill presented by it that those who were at first adversaries, *i.e.*, Shaffer and Dal–Worth, became aligned against St. Paul, and that Shaffer provided Dal–Worth "valuable assistance" at trial due to an incentive for Dal–Worth to recover pursuant to the Mary Carter agreement. Under this record, we are not inclined to hold that the mere existence of a Mary Carter agreement constitutes harmful error.

Once the existence and terms of the agreement were presented to the jury, it was within their province to weigh the credibility of the evidence presented to them. *Flamm v. Ball*, 476 S.W.2d 710, 713 (Tex.Civ.App.—Amarillo 1972, no writ). To hold that the mere existence of a Mary Carter agreement was harmful error, would take from the province of the jury the right to weigh the evidence, to observe each witness and decide what credence should be given to the whole or any part of the testimony, to judge the facts proved, and to then determine the ultimate questions presented for consideration. *See Wilson v. Mathis*, 459 S.W.2d 952, 954 (Tex.Civ.App.—Waco 1970, no writ).

The tainted "favorable" testimony St. Paul points to as so skewing the trial and poisoning the jury so as to result in harmful error, was testimony characterized by St. Paul as tending to show it was the "bad guy." We disagree with this characterization.

The testimony complained of was adduced from Spross, called as a witness by Dal–Worth, who stated that to the best of her knowledge, she thought she forwarded the suit papers to St. Paul. This is not equivalent to a settling defendant vigorously assisting in pointing the finger of culpability. *Cf. Elbaor v. Smith*, 845 S.W.2d at 246.

St. Paul's argument that Spross had an incentive to perjure herself falls far short. The agreement was between Shaffer and Dal–Worth; Spross was not a party to the agreement and was not shown to have an incentive to ensure a favorable outcome for Dal–Worth. *Accord Scurlock Oil Co. v. Smithwick*, 724 S.W.2d at 4. Indeed, at the time of her testimony, she was no longer an employee of Shaffer and, thus, arguably did not even have an incentive to secure her job.

As noted earlier, St. Paul followed the precautionary measures espoused in *Scurlock*, thereby mitigating the harm presented by the agreement. The facts presented in the present case are not so skewed as to establish distortion of the entire trial, nor did Shaffer argue for higher damages, present witnesses, or otherwise vigorously point the finger of liability at St. Paul. *Cf. Scurlock Oil Co. v. Smithwick*, 724 S.W.2d at 7 (noting that the obvious prejudicial effects on a non-settling defendant in a "Mary Carter" situation are that the plaintiff and settling defendant gang up on the non-settling defendant, jointly point the finger of liability, and the settling defendant argues for higher damages).

On balance, the introduction and treatment of the Mary Carter agreement was not harmful to St. Paul and, as a result, the trial court did not err in overruling its motion for new trial. St. Paul's first point of error is overruled.

## COVERAGE

Contending by its second point of error that the polices did not afford coverage for Mission Butane's claims, St. Paul proposes

the trial court erred in ruling it had a duty to defend the lawsuit against Dal–Worth. St. Paul's failure to preserve this complaint for our review permeates its third- and fourth-point contentions that the trial court erred in denying its motions for mistrial and new trial because comments referring to the ruling were erroneous.

Prior to voir dire proceedings, the trial court, recognizing the need for a ruling on St. Paul's duty to defend the lawsuit against Dal–Worth so the parties could present their positions accordingly, heard testimony from Talbot that upon receipt of the lawsuit papers, they were forwarded to Lawrence, and it was believed that St. Paul was "handling" the matter. The trial judge told the parties if they would be present at 8:15, he would make his ruling then. Shortly thereafter, court was recessed.

Whether the parties appeared and the court made a ruling is not recorded in the appellate record. Although we glean from statements in the record that the court ruled St. Paul had a duty to defend subject to a finding that it received notice of the lawsuit, neither the ruling itself nor an objection, if any was made, is recorded. Nevertheless, throughout the remainder of the proceedings, and at times during the trial, the court and the parties, including counsel for St. Paul, referred to the ruling without objection.

■ Still, St. Paul has not directed us to any portion of the record where preservation of the error can be found, and we have found none in our independent search. *Miller v. Kendall,* 804 S.W.2d 933, 938 (Tex.App.—Houston [1st Dist.] 1990, no writ). The burden was on St. Paul to provide a sufficient record to establish the error of which it complains. Tex.R.App.P. 50(d). We cannot pass on matters outside the appellate record. *Exocet Inc. v. Cordes,* 815 S.W.2d 350, 356 (Tex.App.—Austin 1991, no writ); and *Morris v. Porter,* 393 S.W.2d 385, 391 (Tex.Civ.App.—Houston [1st Dist.] 1965, writ ref'd n.r.e.).

■ Though without a duty to do so, we have searched the copious record, a statement of facts consisting of over 3,000 pages in 15 volumes, to determine whether St. Paul

preserved its complaint of error. *Cf. Saldana v. Garcia,* 155 Tex. 242, 285 S.W.2d 197, 201 (1956) (holding it is not the duty of the appellate court to make an independent search of the statement of facts). We note that St. Paul states in its motions for mistrial and new trial that after the trial court's ruling on the duty to defend, it "requested" the jury not be informed of the ruling, which request was denied. Such a request does not constitute a stated objection specifying the grounds for the court's ruling as required by rule 52(a). *PGP Gas Products, Inc. v. Fariss,* 620 S.W.2d 559, 560 (Tex.1981).

■ St. Paul's objections in the forms of motions for mistrial and new trial were untimely and insufficient to preserve any error for our review. *Accord Prade v. Helm,* 725 S.W.2d 525, 527 (Tex.App.—Dallas 1987, no writ). Objections made after the case has been submitted to the jury are untimely. *McKinney v. National Union Fire Ins. Co.,* 747 S.W.2d 907, 910 (Tex.App.—Fort Worth 1988), *aff'd,* 772 S.W.2d 72 (Tex.1989).

Any objection in the motion for mistrial was untimely because all parties referred to the ruling without objection throughout voir dire proceedings and the trial, *New Hampshire F. Ins. v. Plainsman Elevators, Inc.,* 371 S.W.2d 68, 72 (Tex.Civ.App.—Amarillo 1963, writ ref'd n.r.e.), full testimony on the subject had been heard, *Farmland Mut. Ins. Co. v. Alvarez,* 803 S.W.2d 841, 846–47 (Tex.App.—Corpus Christi 1991, no writ), and closing arguments had been made. *Rodriguez v. Universal Fastenings Corp.,* 777 S.W.2d 513, 519–20 (Tex.App.—Corpus Christi 1989, no writ). Objections raised for the first time in a motion for new trial are insufficient to preserve any error. *Pierson v. Noon,* 814 S.W.2d 506, 508 (Tex.App.—Houston [14th Dist.] 1991, writ denied).

St. Paul proposes by its third- and fourth-point contentions that the trial court and opposing counsel improperly commented on the ruling. We do not entertain the proposal. To preserve the matter for appellate review, St. Paul was obligated to distinctly specify that objection to the trial court. Tex.R.App.P. 52(a); *State v. Lemon,* 603 S.W.2d 313, 320 (Tex.Civ.App.—Amarillo 1980, no writ). Objections to the comments com-

plained of are not shown in the record at the places referenced in St. Paul's brief, and we have found no objections voiced elsewhere in the record which would be considered timely. St. Paul has, therefore, waived any complaint on this ground. *Davis v. Campbell*, 572 S.W.2d 660, 663 (Tex.1978).

To the extent St. Paul contends the trial court improperly commented on the weight of the evidence, we cannot entertain the contention. Any objection to an improper comment by the trial court must be made at the time of its occurrence if the error is to be preserved for appellate review unless the comment is of a character which cannot be rendered harmless by proper instruction. Tex.R.App.P. 52(a).

Some of the comments referenced by St. Paul as objectionable were made outside the presence of the jury and, therefore, it is axiomatic they could not have impacted the jury's findings. The remainder of the comments were made either to state the ruling as it was made, or to clarify the ruling in response to a mischaracterization. Since the original ruling is not in the record, we cannot say whether the restatement of it was proper, but there being no recorded objection made to it, we must presume that it was restated correctly.

St. Paul's contention that the trial court erroneously "instructed" the jury concerning the duty to defend is specious. As conceded by St. Paul, there was no written instruction to the jury concerning this issue. Moreover, the stated references to which St. Paul directs our attention were not made by the judge, but by counsel for the parties. Consequently, St. Paul's second, third and fourth points of error are overruled in their entirety.

## SUFFICIENCY OF THE EVIDENCE

Utilizing its fifth through sixteenth points of error, St. Paul contends there was no, or factually insufficient, evidence to support the jury's findings that (9–10) Dal–Worth sent and (5–6) St. Paul received the lawsuit papers; (7–8) St. Paul had actual knowledge of the lawsuit; (15–16) Shaffer was St. Paul's agent and (11–12) Shaffer did not fail to send

the lawsuit papers to St. Paul; and (13–14) St. Paul was not prejudiced by any failure to send the lawsuit papers. These contentions will be discussed concurrently.

## Standards of Review

In our examination of the contentions of a lack of evidence, we must review the entire record to determine whether there is more than a scintilla of evidence to support the findings, *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965), and if so, the findings will be upheld. *Stedman v. Georgetown S. & L. Ass'n*, 595 S.W.2d 486, 488 (Tex.1979). Evidence is merely a scintilla when it is so weak as to do nothing more than create a mere surmise or suspicion of a fact. *Seideneck v. Cal Bayreuther Associates*, 451 S.W.2d 752, 755 (Tex.1970). We must consider only the evidence and the reasonable inferences which can be drawn therefrom in their most favorable light to support the jury's findings while disregarding all contrary evidence and inferences. *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993).

If there is some evidence to support the findings, we must then determine its factual sufficiency. In so doing, we must consider and weigh all the evidence and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985). All evidentiary complaints herein will be evaluated utilizing these standards of review.

## Notice of Lawsuit

Asfeld testified that although Killian told her in December of 1988 he would be filing the lawsuit "soon" because of a statute of limitations problem, she felt he was merely threatening suit and probably would not file one. In March of 1989, Sarcozy, an employee of Ranger, told Asfeld she thought the lawsuit had been filed. Despite this information, St. Paul admittedly did nothing to verify whether suit had been filed.

Asfeld telephoned Talbot immediately after speaking with Killian, but she did not tell him of Killian's threat of an imminent suit.

Neither did she convey to Talbot the later statement of Sarcozy that she believed suit had been filed, because she had called Bayer, from whom she got a different answer, and chose to believe Bayer. Asfeld further assumed that since Ranger would not file suit, neither would its insured nor anyone else, including Flores.

Charles Shaddox, an attorney specializing in insurance cases, Kenneth Shumaker, and Dwayne Spiess, expert witnesses testifying on behalf of Dal–Worth, were critical of St. Paul's, and specifically Asfeld's, handling of the investigation of the claim and of the failure to tell Talbot what to do in case of a suit. The inaction was especially egregious in the face of the statement by Killian that suit would be filed "soon" and Sarcozy's statement that she believed suit had been filed.

Talbot testified that on at least two occasions after he gave the suit papers to Lawrence, he specifically asked Asfeld the status of the "Mission suit," and was told St. Paul was "investigating" it. Further, Shaffer told him that St. Paul intended to answer the suit, and Talbot believed St. Paul was handling the matter.

In addition to Asfeld's failure to tell Talbot about the possibility of the imminent suit, neither she, nor anyone associated with St. Paul, told Talbot that the procedures followed in forwarding information to St. Paul could affect coverage of the claim. In spite of these events, St. Paul now asserts a good faith denial of coverage based upon Dal–Worth's failure to send the papers directly to St. Paul without routing through the agents.

It was uncontroverted that St. Paul placed no significance in the channels through which papers pertaining to claims and lawsuits were sent, and Talbot was not told he should route lawsuit papers though any specified agency. Conformably, he forwarded the lawsuit papers through the same channels he had sent the claim, the DTPA notice letter, and other claims, lawsuits and information, the channels Asfeld approved.

Spross testified that Dal–Worth's claim information was usually sent to Skeels as the "managing general agent" for St. Paul.

However, upon receiving the lawsuit papers, she was "pretty sure" she forwarded them by mail directly to St. Paul at its San Antonio office, particularly because St. Paul already had a working claim file on the subject of the lawsuit. Despite that the record, and Shaffer's files, are devoid of any documentation of this mailing, the testimony is some evidence that Shaffer sent the papers to St. Paul.

St. Paul maintains that the lack of supporting evidence to show Spross's mailing substantiates its contention that the evidence was insufficient to establish the papers were in fact mailed, and strengthens the testimony of Asfeld and Larsen that St. Paul unequivocally did not receive the lawsuit papers. Dal–Worth combated this inference with evidence that St. Paul's San Antonio office was disorganized and things were frequently out of place and misfiled, and insureds suffered delays as a result of the disorganization, leading Dal–Worth to infer that the papers may have been received by St. Paul but misfiled or misplaced.

According due deference to the jury's role to believe or disbelieve any portion of a witness's testimony and the evidence presented, *City of Amarillo v. Reid*, 510 S.W.2d 624, 628 (Tex.Civ.App.—Amarillo 1974, writ ref'd n.r.e.), there is some evidence in the record from which the jury could have found that Dal–Worth sent the lawsuit papers to St. Paul, and there is other evidence from which the jury could have found that St. Paul received the papers.

Scott, acting as Asfeld's supervisor, was handling her files while she was vacationing over Spring Break. On 1 March 1989, telephone records show, and Scott testified, that he had a four minute conversation with Spross at Shaffer's office. Though the specifics of the conversation are not detailed, Scott hand-wrote and then faxed a claim memo to Spross setting reserves on the claim at $10,000. Scott did not file the memo or cover letter in the proper file.

David Mullens, a partner with Skeels, testified that St. Paul seemed to be disorganized or in disarray with respect to the claims handling department, and further, that St. Paul's claims office

didn't always know who was assigned to a certain claim, did not always appear to respond on a timely basis. And on one specific occasion ... [Mullens] had to call two or three different St. Paul offices before [he] and The St. Paul could even figure out who it was out in California that was handling this particular claim. And it was just a real unorganized tedious mess. [Mullens] wasn't happy with it.

Asfeld agreed that from time to time, things can be misfiled in an organization as complicated as St. Paul. In response to queries regarding whether he could recall any specific instance of documents lost by St. Paul, Mullens testified as follows:

ANSWER: You know, there's—I think that probably has to do with the Mission thing, though where the San Antonio office said they didn't have the documents, although they had apparently been sent.

QUESTION: Are you talking about the suit papers in this particular Mission Gas Company lawsuit?

ANSWER: Yes. That's probably what I'm thinking about, yes.

Though he testified that he did not believe St. Paul had notice of the lawsuit prior to the default judgment, Mullens's file notes indicated that he held a belief that St. Paul might have had actual notice of the lawsuit prior to the default judgment.

Applying the standards of evidential review, we deem the evidence was both legally and factually sufficient for the jury to find that Dal–Worth sent, and St. Paul received, the lawsuit papers, and that St. Paul had actual knowledge of the lawsuit. St. Paul's fifth through tenth points of error are overruled.

### Agency

Still, apparently because the just recounted testimony did not contain testimony of its actual receipt of the lawsuit papers, St. Paul maintains evidence is absent or insufficient to support the jury's finding that Shaffer was its agent. It seems undisputed that if Shaffer was St. Paul's agent, any evidence of Shaffer's failure to send the papers to St. Paul, or to Skeels, works against St. Paul, not Dal–Worth.

When asked if she investigated whether Shaffer was St. Paul's agent, the following colloquy took place between Asfeld and Shaffer's counsel:

Q. Well, in this case, you did go after you found out that one of the issues you-all were focusing on was whether or not St. Paul got notice of this claim or this lawsuit paper. You went to the home office directly to find out if Surry Shaffer was appointed as an agent for St. Paul, didn't you?

A. Yes.

Q. You wanted to find that out because you knew at that time Shaffer was your agent and he got the papers, you couldn't claim that they were out of coverage?

A. If he was an agent of St. Paul and he had failed to forward them to St. Paul, St. Paul would be responsible for his error, that is correct.

St. Paul disputes that Shaffer was its agent.

The question of agency is one of fact, and circumstantial evidence may be used to establish the agency and the extent of the agent's authority. *Foundation Reserve Insurance Co. v. Wesson,* 447 S.W.2d 436, 438 (Tex.Civ.App.—Dallas 1969, writ ref'd). For there to be an agency relationship, there must be some act constituting an appointment of a person as an agent; it is a consensual relationship. *Carr v. Hunt,* 651 S.W.2d 875, 879 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). Consent may be implied rather than express. *Id.* Apparent authority is based upon the doctrine of estoppel, and one seeking to charge the principal through apparent authority of the agent must establish conduct by the principal which would lead a reasonable prudent person to believe the agent has the authority he purports to exercise. *Biggs v. United States Fire Ins. Co.,* 611 S.W.2d 624, 629 (Tex.1981).

Only the conduct of the principal, leading one to suppose that the agent has the authority he purports to exercise, may charge the principal through the apparent authority of an agent. *Southwest Title Ins. Co. v. Northland Bldg. Corp.,* 552 S.W.2d 425, 428 (Tex.1977). And the principal may

be charged with an unauthorized act of an agent, or one purporting to be an agent, provided the principal, with full knowledge of all material facts surrounding the unauthorized act, ratifies the act, even by implication. *Bankers Protective Life Ins. Co. v. Addison,* 237 S.W.2d 694, 697 (Tex.Civ.App.—Amarillo 1951, no writ).

■ A broker who bills for and collects premiums on behalf of an insurer not admitted to do business in Texas is an agent for the insurer. *Foundation Reserve Insurance Co. v. Wesson,* 447 S.W.2d at 438. There was undisputed evidence presented to establish that Shaffer collected premiums from Dal–Worth and sent them on to St. Paul, either directly or through Skeels.

Furthermore, Spiess opined that Lawrence, Shaffer and Skeels were all agents of St. Paul as far as receiving the lawsuit papers. He further testified that he was led to believe when he read the memos in Asfeld's files that there was no objection on the part of St. Paul for the way claims were coming to the company. Surry Shaffer testified that he was authorized to receive claims and lawsuit information and send it to Skeels, though he often dealt directly with St. Paul without objection. Talbot said Asfeld told him to "keep sending anything that came in the same way it had always been sent." Asfeld acquiesced that the DTPA letter from Killian was forwarded through "proper channels," and it did not matter how the information got there, as long as she received it.

There is other evidence of Shaffer's actual and apparent authority to act as St. Paul's agent. Asfeld's files revealed that Talbot's method of reporting through Shaffer rather than Skeels was condoned. Mullens was under the impression Shaffer and St. Paul were dealing directly with each other, even though that was not the standard procedure. And Mullens considered Shaffer to be a "retail agent in relation to [his] agency, which was the surplus lines agent for St. Paul," albeit he did not understand Shaffer to be the agent of St. Paul. This evidence establishes, at a minimum, that Shaffer was a subagent of St. Paul.

■ A subagent is a person appointed by an agent to perform some duty, or the whole of the business relating to his agency. He may be the agent of the agent, or he may be the agent of the principal depending upon the agreement creating the primary agency, or upon the circumstances. *James v. CPR Corp.,* 623 S.W.2d 733, 740 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). One may be a subagent and yet sustain no contractual relation to the principal.

■ Again applying the evidential standards of review, the evidence outlined above was sufficient to support the jury's findings that Shaffer was St. Paul's agent, and its refusal to find that Shaffer failed to forward the lawsuit papers to St. Paul.[9] Those determinations by the jury moot St. Paul's contentions that the evidence was lacking or insufficient to show it was not prejudiced by any failure to forward the papers. St. Paul's eleventh through sixteenth points of error are overruled.

### Deceptive Acts, Unconscionable Actions, and Proximate or Producing Cause

St. Paul utilizes its seventeenth and eighteenth points of error to contend there was no, or insufficient, evidence to support the jury's findings that it engaged in unfair or deceptive acts, which were the proximate cause of damages to Dal–Worth. St. Paul advances, in its nineteenth and twentieth points, the same evidential deficiency to support the jury's findings that it engaged in an unconscionable action or course of action, which was a producing cause of damages to Dal–Worth. The findings attacked were made by the jury in answering question seven, which inquired about deceptive acts; question eight, which inquired about any unconscionable action; and questions nine and ten, which inquired, whether the deceptive acts or unconscionable action proximately caused, respectively, the entry of the default judgment, and damage to Dal–Worth.

### DTPA Violations

Question number 7 and the jury's answer thereto, the foundation for St. Paul's eviden-

---

9. The agency finding satisfies any concerns Shaffer expressed in his brief, though not by a cross-point, concerning the affirmance of "judgment for Shaffer."

tiary complaints against the finding of unfair or deceptive acts, read:

QUESTION NO. 7

Did St. Paul Insurance Company engage in any unfair or deceptive act or practice?

Unfair or deceptive act or practice means any of the following:

1. A deceptive act or practice means an act or series of acts that have the tendency to deceive an average ordinary person, even though that person may have been ignorant, unthinking, or gullible.

or

2. Making or causing to be made any statement misrepresenting the terms, benefits, or advantages of an insurance policy,

or

3. Making or directly or indirectly causing to be made, any assertion, representation, or statement with respect to insurance that was untrue, deceptive or misleading,

or

4. Omitting any information or making any false implication or impression that was either misleading or deceptive or had the capacity to be misleading or deceptive,

or

5. Making any misrepresentation relating to insurance.

Misrepresentation means any failure to state a material fact that is necessary to prevent the statements made from being misleading, when these statements are considered in the light of the circumstances under which they are made,

or

6. Not attempting in good faith to effectuate a prompt, fair, and equitable settlement of a claim when liability has become reasonably clear,

or

7. Refused to pay a claim without conducting a reasonable investigation based upon available information.

Answer "Yes" or "No"

ANSWER: __Yes__

If there was sufficient evidence to support any of the alternative issues within the question, the finding will be affirmed. *Jeep Eagle Sales v. Mack Massey Motors*, 814 S.W.2d 167, 171 (Tex.App.—El Paso 1991, writ denied).

Spiess and Shaddox were critical of St. Paul's failure to attempt to settle the matter, and its failure to hire an attorney for Dal–Worth as soon as it learned of the default judgment. They felt that St. Paul's handling of the matter was well below the industry standard for a good faith, proper handling of the claim. Spiess testified "it was outrageous claims handling and you can see what is going to happen when a claim is not properly investigated or defended that the insured now is going to suffer serious consequences." Both Shaddox and Spiess testified that St. Paul's statements about the coverage were false and misleading and that St. Paul made an improper evaluation of the coverage, and Spiess noted that St. Paul's files indicated it knew it was wrong. Both men felt that St. Paul failed to implement proper standards to provide adequate investigation of the claims.

The record reveals that although St. Paul received Killian's DTPA letter before the time for response had elapsed, it took no action. Further, in the face of Killian's statement that he would be filing suit soon, and Sarcozy's statement that suit had been filed, St. Paul admittedly did not investigate the veracity of the statements.

Evidence in the present instance was sufficient to show Dal–Worth forwarded the lawsuit papers through channels approved by St. Paul, and agents of St. Paul actually received them. Furthermore, Asfeld was told the lawsuit had been filed, yet did nothing to verify the statement though she spoke with Talbot seven or eight times in the months between the filing of the lawsuit and the taking of the default judgment.

St. Paul's claim file does not reflect, and Talbot does not recall, that Asfeld, or anyone from St. Paul, ever told Talbot there could be a problem with coverage. Spiess and Shaddox testified that the information before St. Paul was that there was coverage for the claims and that St. Paul's denial of coverage was a misrepresentation of coverage and its actions fell below acceptable industry stan-

dards. Misrepresentation as to coverage and benefits are precisely the sort of conduct which gives rise to a DTPA cause of action. *Aetna Cas. and Sur. Co. v. Marshall,* 724 S.W.2d 770, 772 (Tex.1987).

▇ Notwithstanding this evidence, St. Paul, selecting other evidence and relying upon the holdings of three cited decisions, contends it had no duty to investigate whether a lawsuit had been filed, because it was Dal–Worth's responsibility to notify it of the lawsuit by forwarding the lawsuit papers, which Dal–Worth failed to do. This is true, St. Paul submits, because failure by the insured to notify the insurer of a suit against the insured as required by the policies precludes suit against the insurer if it is prejudiced by the lack of notice. *Dairyland County Mutual Ins. Co. of Texas v. Roman,* 498 S.W.2d 154, 157 n. 2 (Tex.1973).

▇ The contention is sufficiently answered by reference to our earlier sustainment of the jury's findings that Dal–Worth forwarded the lawsuit papers to St. Paul, and that St. Paul had notice of the lawsuit prior to the default judgment. We further observe that in regard to the evidence selected by St. Paul as contrary to the evidence upon which the jury made its finding, we cannot set aside the jury's verdict merely because the jury could have drawn conclusions different from those it considered the most reasonable. *State Farm Fire and Cas. Co. v. Price,* 845 S.W.2d 427, 438 (Tex.App.—Amarillo 1992, writ dism'd by agr.). Moreover, the authorities upon which St. Paul relies are inapposite in that the facts in each were that the insured did not cooperate with the insurer in its investigation and had not forwarded the lawsuit papers to the insurer until after a default judgment had been taken. In this cause, the jury found the lawsuit papers were sent to St. Paul, and it was uncontroverted that Dal–Worth cooperated with St. Paul in its investigation. Given the state of the evidence, there was some evidence of probative force supporting the jury's challenged responses.

### Unconscionable Actions

The jury also answered "Yes" to the eighth inquiry, whether St. Paul engaged in an un-conscionable action or course of action which was a producing cause of damage to Dal–Worth. In submitting the inquiry, the court employed the statutory definition to instruct the jury that an unconscionable action or course of action means an act or practice which, to a person's detriment, either:

> (A) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or

> (B) results in a gross disparity between the value received and consideration paid, in a transaction involving the transfer of consideration.

Tex.Bus. & Com.Code Ann. § 17.45(5) (Vernon 1987).

▇ The term "gross" should be given its ordinary meaning of glaringly noticeable, flagrant, complete and unmitigated. *Chastain v. Koonce,* 700 S.W.2d 579, 583 (Tex.1985). Accordingly, under subdivision B of section 17.45(5), *supra,* "a slight disparity between the consideration paid and the value received is not unconscionable; a glaring and flagrant disparity is. Taking advantage of a consumer's lack of knowledge to a grossly unfair degree thus requires a showing that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Id.*

Aside from St. Paul's preface that the findings of its liability must fall if the finding of its duty to defend and to indemnify is overturned, which we heretofore declined to do, St. Paul contends there was a lack of evidence of any unconscionable act as explicated in section 17.45(5)(A), *supra.* This obtains, St. Paul reasons, because Talbot's business sophistication diminished or eradicated St. Paul's ability to take advantage of Dal–Worth to an unfair and unconscionable degree. We are not so persuaded.

▇ Even accepting Talbot's business sophistication, he was told to "wait until [St. Paul] decided what they were going to do," and then St. Paul did nothing to have the default judgment set aside. Evidence that an insurer lulls an insured into inaction and, when pressed for action, searches through the policy to find a way to escape liability, is evidence of unconscionable conduct. *HOW*

*Ins. v. Patriot Financial Services,* 786 S.W.2d 533, 541 (Tex.App.—Austin 1990, writ denied), *overruled on another ground, Hines v. Hash,* 843 S.W.2d 464, 469–70 (Tex.1992).

Further, in connection with the issues on coverage, an insurer is in a better position than the insured to have a detailed understanding of the extent of coverage and procedural aspects of the policies. *Id.* Evidence that St. Paul had superior knowledge and expertise was sufficient to support the finding of unconscionability. *Jeep Eagle Sales v. Mack Massey Motors,* 814 S.W.2d 167, 175 (Tex.App.—El Paso 1991, writ denied).

St. Paul also reasons there was a lack of evidence of a gross disparity between the value paid and the benefits received to amount to an unconscionable act. St. Paul maintains Dal–Worth received coverage on its other claims and lawsuits in return for its premiums, which evinces there was no unconscionable act.

To the contrary, Dal–Worth asserts that it paid premiums to St. Paul, but received no coverage in return. If the value contracted for and paid by the consumer was never received, a gross disparity between the value paid and the value received results, and the finding of unconscionability will be supported. *Allied General Agency, Inc. v. Moody,* 788 S.W.2d 601, 605–06 (Tex.App.—Dallas 1990, writ denied, improvidently granted).

The record reveals that, in relation to the Mission Butane claim resulting in the default judgment, Dal–Worth did not receive the coverage or defense for which it had paid premiums. Whether Dal–Worth received coverage for other claims not at issue here is irrelevant to the question of whether coverage for the Mission Butane suit was improperly denied.

### Proximate or Producing Cause of Damages

St. Paul contends that its actions found by the jury to be violative of the DTPA were not the proximate cause of any harm to Dal–Worth because there was no harm until the default judgment was taken, and even then the majority of the harm was caused by the filing of bankruptcy, for which St. Paul had

no responsibility. Further, its actions could not be the proximate cause of Dal–Worth's damages because the default judgment was not foreseeable without proper notice of the lawsuit, which Dal–Worth failed to provide.

As material in this cause, the elements of a DTPA claim which must be proved are that the plaintiff is a consumer, that the defendant has committed a false, misleading, or deceptive act or practice within the meaning of section 17.46 of the DTPA, or any unconscionable action or course of action, either of which was a producing cause of actual damages. Tex.Bus. & Com.Code Ann. § 17.50(a) (Vernon 1987). Producing cause does not include the element of foreseeability; therefore, the consumer need only prove the defendant's deceptive act or unconscionable action in a natural sequence excited, contributed to, or factually caused the damages alleged. *Jeep Eagle Sales v. Mack Massey Motors,* 814 S.W.2d at 175–76.

Despite Dal–Worth having the burden of only proving that a DTPA violation was a producing cause of damages, the charge of the court placed upon it the heavier burden of proving a proximate cause of damages, the causation element of a negligence cause of action. There is no appellate complaint of the court's incorrect submission; consequently, we deem the parties accepted the submission as a correct one, by which they are bound. *Allen v. American National Insurance Company,* 380 S.W.2d 604, 609 (Tex.1964).

Proximate cause consists of cause in fact and foreseeability. Cause in fact means the act or omission was a substantial factor in bringing about the injury, and without it harm would not have occurred. Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers his act or omission created for others. Foreseeability does not require that the actor anticipate the particular danger, but only that he reasonably anticipate the general character of the injury. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex. 1992).

To satisfy the cause in fact element of proximate cause, Dal–Worth had to prove that it was more probable than not that but for St. Paul's conduct, the default judgment would not have occurred. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 313 (Tex.1987). Dal–Worth met its burden by convincing the jury by a preponderance of the evidence that St. Paul had actual knowledge of the existence of Mission Butane's lawsuit before the date of the default judgment. It does not profit St. Paul to argue that the majority of the harm was caused by Dal–Worth's filing for bankruptcy for which St. Paul had no responsibility, for Dal–Worth only had to prove the greater probability that St. Paul's conduct was a cause of the harm. *Id.*

Because the jury found that St. Paul received the lawsuit papers before the default judgment was taken, St. Paul's argument that the default judgment was not foreseeable is not entitled to credit. Beyond that, an insurer should reasonably anticipate that the default judgment, while uncontested and unpaid, would affect Dal–Worth's financial reputation and credit rating, thereby adversely affecting its ability to operate as a business venture. St. Paul's seventeenth through twentieth points of error are overruled.

### Knowing Conduct

With its twenty-first and -second points of error, St. Paul contends there is no or insufficient evidence to support the jury's finding that it engaged in knowing conduct violative of the DTPA. St. Paul further contends, by its twenty-third and -fourth points of error, there is no or insufficient support for the award of additional damages based upon the finding of knowing conduct.

The contentions are founded on St. Paul's claims that (1) it had no actual awareness of the suit and no duty to search to find it, (2) it was justified in denying coverage due to the lack of notice of the lawsuit, and (3) it could not have made matters any worse by denying coverage after the default judgment was taken and the damage done. This being so, St. Paul submits that the finding of knowing conduct cannot be supported.

"Knowingly" was defined for the jury as, "actual awareness of the falsity, deception, or unfairness of the conduct in question. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness." The definition follows the language of DTPA section 17.45(9), *supra,* and there was no exception taken to the definition as given.

The jury determined that there was sufficient evidence to establish St. Paul's actual notice of the suit and coverage under the policies of insurance. Moreover, there was evidence indicating St. Paul could have saved Dal–Worth from the default judgment by having it set aside, since all indicators were that Dal–Worth had no liability in the rollovers, and Killian would have dropped the suit if a defense had been presented, or would have settled the matter for $17,000 if offered before 27 December 1989. In addition, Spiess testified that St. Paul's files indicated St. Paul was aware its actions were detrimental to Dal–Worth.

Because there was evidence sufficient to support the jury's determination that St. Paul engaged in knowing conduct violative of the DTPA, the award of additional damages was proper. St. Paul's twenty-first through -fourth points of error are overruled.

### NEGLIGENCE

As previously noticed, the jury, in answering question number 5, found that St. Paul "was negligent in the handling of the Mission claim and lawsuit against Dal–Worth which was a proximate cause of damages to Dal–Worth." Relying upon *United Serv. Auto. Ass'n v. Pennington,* 810 S.W.2d 777 (Tex. App.—San Antonio 1991, writ denied), St. Paul uses its twenty-fifth point of error to contend the trial court erred in submitting question number 5, because it inquired into a breach of duty which does not exist under Texas law, and there was no guiding instruction concerning the failure to settle the matter within the policy limits. Thus, St. Paul contends, by its twenty-sixth and -seventh points of error, that the case should be reversed because there was no or insufficient evidence to support the jury's findings that St. Paul was negligent and such negligence

was the proximate cause of damages to Dal–Worth.

St. Paul's sweeping statement, based upon a holding in *Pennington*, that "Texas law does not impose upon St. Paul the duty to handle claims in a non-negligent manner," is too broad. The *Pennington* court was called upon to determine whether a tort cause of action exists for an insurer's wrongful refusal or failure to defend its insured. *Id.* at 783. Finding that Pennington did not plead, prove or request a jury instruction on the cause of action and, therefore, waived it, the court, noticing that matters of insurance necessarily arise from contracts, held that:

> In the absence of pleadings and proof ... [of] failure to act in good faith and to deal fairly with [the insured], or that it negligently failed to accept a settlement, no tort liability arises.

*Id.* at 783–84. St. Paul contends this holding precludes a cause of action for negligent handling of a claim absent a showing that the insurance company failed to accept a settlement, because there is no duty under Texas law for the insurer to handle claims in a non-negligent manner.

■■■ To the contrary, it is settled that the special relationship between an insured and an insurer imposes upon the insurer a duty to investigate claims thoroughly and in good faith. *Viles v. Security Nat'l Ins. Co.,* 788 S.W.2d 566, 568 (Tex.1990). Hence, any negligence on the part of St. Paul or its agent in the investigation, preparation for defense of the lawsuit, trial of the cause, and reasonable attempts to settle, would support a cause of action for damages. *Ranger County Mut. Ins. Co. v. Guin,* 723 S.W.2d 656, 659 (Tex.1987). St. Paul's twenty-fifth point of error is overruled.

■■■ Because St. Paul relies upon its contention that it had no duty to handle claims in a nonnegligent manner, it has neither presented argument nor cited authorities to maintain its points that there was no or insufficient evidence to support the jury's findings that it was negligent, which was the proximate cause of damages to Dal–Worth. Consequently, St. Paul has not met the briefing rule requirement for consideration of the points on appeal. Tex.R.App.P. 74(f); *Saldana v. Garcia,* 285 S.W.2d at 200–01. Its twenty-sixth and -seventh points of error are overruled.

By its twenty-eighth and -ninth points of error, St. Paul contends there was no or insufficient evidence to support the jury's finding that it was negligent in failing to investigate whether suit was filed, and that such negligence was the proximate cause of Dal–Worth's damages. This is so, St. Paul reasons, because it owed no duty to Dal–Worth to investigate whether suit had been filed; rather, Dal–Worth owed it a duty to send it notice of the lawsuit.

St. Paul's contention and reasoning are circumvented by the prior determination of sufficient evidence to show Dal–Worth sent, and St. Paul received, notice of the lawsuit. Additionally, there was evidence from which the jury could have inferred that St. Paul should have inquired further concerning the statements made by Killian and Sarcozy. St. Paul's twenty-eighth and -ninth points of error are overruled.

### Gross Negligence

Given the sustainment of the jury's finding of St. Paul's negligence, we reach St. Paul's thirtieth through thirty-third points of error, by which it attacks the jury's gross negligence findings. By these points, St. Paul contends there is no or insufficient evidence to support the jury's findings that it was grossly negligent, that such negligence was the proximate cause of damages to Dal–Worth, and that Dal–Worth was entitled to $11,500,000 as exemplary damages. However, the points are mooted by the lack of Dal–Worth's recovery of exemplary damages under its election between alternative measures of damage, unless, as Dal–Worth maintains in its cross-point, it was entitled to judgment for both exemplary damages and attorney's fees.

### CROSS–POINT

Dal–Worth predicates its entitlement to exemplary damages and attorney's fees on the principles that both the DTPA and Article 21.21 of the Insurance Code provide that the statutory remedies are cumulative of oth-

er remedies, *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 136 (Tex. 1988), and a plaintiff is allowed to recover simultaneously under the DTPA and other legal theories. *Kish v. Van Note*, 692 S.W.2d 463, 467 (Tex.1985). Conformably, Dal–Worth argues that it should be allowed, under common law, the exemplary damages found by the jury and allowed, under the Code, the attorney's fees fixed by the jury. The principles cited by Dal–Worth are subsisting; indeed, they produce the corollary principle that when a plaintiff successfully prosecutes a cause on alternative theories of recovery, he has a right to judgment on the theory entitling him to the greatest relief. *Boyce Iron Works v. S.W. Bell Telephone*, 747 S.W.2d 785, 787 (Tex.1988).

 Notwithstanding, the circumstances of this cause invoke the overriding principle that a plaintiff may not recover both exemplary damages and statutory treble damages on the finding of actual damages resulting from the same acts or course of conduct, because that would amount to a double recovery of punitive damages. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 367 (Tex.1987); *Allstate Ins. Co. v. Kelly*, 680 S.W.2d 595, 606 (Tex.App.—Tyler 1984, writ ref'd n.r.e.). As this cause was submitted to the jury, the jury was requested to find whether, and did find that, St. Paul's deceptive acts and conduct, as well as its negligence, were the proximate and producing cause of the same damages. Absent separate and distinct findings of actual damages on both the deceptive conduct and acts of negligence, the allowance of exemplary damages and attorney's fees in addition to the statutory treble damages awarded would amount to a double recovery of punitive damages. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d at 367. Dal–Worth's cross-point is overruled.

### DUTY OF GOOD FAITH AND FAIR DEALING

To sustain the jury's validation of its claim that St. Paul breached its duty of good faith and fair dealing, Dal–Worth must have presented evidence sufficient to show St. Paul had no reasonable basis for denying coverage, *Arnold v. Nat. County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987), based upon the facts and circumstances before St. Paul at the time of the denial. *Viles v. Security Nat. Ins. Co.*, 788 S.W.2d at 567. St. Paul contends, by points again numbered as thirty and thirty-one,[10] that Dal–Worth failed to carry its burden, because there was no or insufficient evidence to support the jury's finding that it, St. Paul, breached its duty of good faith and fair dealing.

To corroborate its contention, St. Paul first proposes that the evidence developed at trial was not before it at the time of the denial; however, much of the evidence presented came from St. Paul's files and the testimony of its employees. Next, St. Paul points to its reliance upon the opinion letter provided by counsel as the reasonable basis for its denial of coverage. *Fuentes v. Texas Employers' Ins. Ass'n*, 757 S.W.2d 31, 33 (Tex.App.—San Antonio 1988, no writ). Further, St. Paul views its denial to be reasonable as a matter of law, *National Union Fire Ins. v. Hudson Energy*, 780 S.W.2d 417 (Tex.App.—Texarkana 1989), *aff'd*, 811 S.W.2d 552 (Tex.1991), because it had information that the notice of suit was late. *See State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 285–86 (Tex.App.—San Antonio 1992, writ denied).

St. Paul offers Ranger's assurance to Asfeld that they were members of arbitration to squelch the statement by Sarcozy that suit had been filed, and to support its contention that it was reasonable for it not to investigate whether suit had actually been filed. Asfeld's electronic notes, made part of the evidence before the jury, indicate she spoke with Sarcozy the week before she spoke with Bayer, who gave her the assurance of arbitration versus the suit being filed. During the time intervening the conversations, Asfeld admittedly did nothing to verify Sarcozy's statement.

St. Paul did not deny coverage until 10 January 1990, some four months after the default judgment was taken. Until that

---

**10.** These points are misnumbered, and should numerically be listed as thirty-three and thirty-four, but for clarity, we will refer to them as thirty-a and thirty-one-a.

point, Dal–Worth was led to believe St. Paul was handling the matter. The Shaffer agency, determined to be St. Paul's agent, assured Dal–Worth there was no problem, and St. Paul was investigating and "defending" Dal–Worth on the claim.

The attorney's opinion letter clearly states there was a "fact question as to whether the insured gave notice of the lawsuit. If it did, [St. Paul] would be on notice of the default judgment." It was undisputed that if St. Paul had notice of the lawsuit prior to the default judgment, it was liable for the breach of its duty of good faith and fair dealing.

■■■ As previously determined, the evidence of notice to St. Paul was sufficient, and the expert testimony was that in the face of the notice, it was unreasonable for St. Paul to deny coverage. Assuming, arguendo, it is proper to infer St. Paul acted upon the advice of counsel in denying coverage, that circumstance alone does not establish St. Paul's good faith and fair dealing; rather, it is only to be considered as a circumstance tending to show good faith. *Nueces Trust Co. v. White*, 564 S.W.2d 798, 806 (Tex.Civ. App.—Corpus Christi 1978, no writ).

Although St. Paul maintains that the claims made in the default judgment were the basis for its denial of coverage, those claims were the ones made in Killian's DTPA demand letter, which was received by St. Paul's San Antonio office. If the claims were the basis for denial, St. Paul could have timely informed Dal–Worth there was no coverage; yet, instead of doing so, St. Paul continued to handle the claim without a question as to coverage.

St. Paul also proffers its reliance upon the recitations in the default judgment to maintain the policies did not afford coverage. Those recitations were Dal–Worth's knowing violations of the DTPA, which St. Paul, by equating "knowing" with "intentional," seizes upon to deny there was an accident or occurrence necessary to invoke coverage. What St. Paul has ignored is that the findings in the default judgment were made in the absence of any answer and defense. The very essence of a default judgment is that the

plaintiff prevails on the allegations of his pleadings simply because the defendant fails to appear, and the judgment is drawn accordingly.

Moreover, St. Paul's files and the testimony of its employees revealed that the investigation of the Mission Butane claim revealed no knowing or intentional wrong acts by Dal–Worth, and that Asfeld in fact relied upon this as justification for not investigating further the filing of lawsuits. St. Paul will not be allowed to now rely upon a judgment rendered by virtue of default to contravene its own investigatory revelations to deny coverage.

■■■ Nor will St. Paul be allowed to rely upon damages awarded by the default judgment to exclude coverage and payment since the damages alleged in Killian's demand letter were identical to those decreed in the default judgment, and St. Paul failed to express any coverage concerns to Dal–Worth until after the default judgment was rendered.[11] Michael Knox, an expert witness testifying on behalf of St. Paul, stated there was actual coverage for some allegations recited in the default judgment. This being the case, there was coverage for defense of the entire suit looking at the allegations in light of the provisions of the policies. *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.*, 387 S.W.2d 22, 24–26 (Tex.1965).

■■■ Further, the damages decreed in the default judgment were a lump sum award. Since some of the damages were covered by the policies and the award was not segregated, the entire lump sum was covered. *Accord Valero Transmission v. Wagner & Brown*, 787 S.W.2d 611, 613–14 (Tex.App.— El Paso 1990, writ dism'd by agr.).

■■■ This evidence was sufficient for the jury to believe that St. Paul lulled Dal–Worth into believing it was handling the matter, and to find that its later denial of coverage was a breach of its duty of good faith and fair dealing. *HOW Ins. Co. v. Patriot Financial Services of Texas, Inc.*, 786 S.W.2d at 541. St. Paul's points of error thirty-a and thirty-one-a are overruled.

**11.** The issues of waiver and estoppel alluded to are discussed in later portions of this opinion.

## STATUTORY LANGUAGE PERTAINING TO INSURANCE POLICIES

██ St. Paul utilizes its points of error numbered thirty-four through -seven to contend the trial court erred in overruling its motion for judgment n.o.v. The error resulted, St. Paul submits, because there was no or insufficient evidence to support the jury's findings that the policies issued by St. Paul, a company not licensed to do business in Texas, did not contain the language required by Texas Insurance Code article 1.14–2, section 7(a).[12] The article, which indisputably applied to St. Paul, must be strictly complied with, and any agent failing to do so is subject to personal liability for any loss covered by the policy. *Accord Foundation Reserve Ins. Co. v. Starnes,* 479 S.W.2d 330, 335 (Tex.Civ. App.—Fort Worth 1972, no writ).

██ Parenthetically, we observe that contrary to St. Paul's characterization of the jury's answers, the jury did not find that the policies did not contain the required language; instead, the jury's "no" answer to each of the first two questions was, under the wording of the court's charge, merely a failure or refusal to find that the policies contained the required language, and simply meant that St. Paul, having the burden of proof on the issues, failed to discharge its burden. *C. & R. Transport, Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex.1966). In this light, it does not profit St. Paul to contend there was no evidence to support the answers, for the failures to find need not be supported by evidence. *Traylor v. Goulding,* 497 S.W.2d 944, 945 (Tex.1973).

Nevertheless, we discern from the arguments under the points that St. Paul contends it established the policies contained the required language as a matter of law. *See O'Neil v. Mack Trucks, Inc.,* 542 S.W.2d 112, 114 (Tex.1976). And we will accept St. Paul's insufficient evidence points as contentions

that the jury's failure to find was against the great weight and preponderance of the evidence. *See Traylor v. Goulding,* 497 S.W.2d at 945. Under this construction of the points of error, St. Paul's contentions will be addressed.

The record reveals, by testimony and demonstrative evidence, that Talbot's copies of the policies failed to have the required stamped language, and only Mullens's copy of the second policy was stamped. However, Mullens testified it was Skeels's standard procedure to follow the statute by affixing the necessary language to policies such as those issued to Dal–Worth. Indeed, the office had a "quality-control" employee whose job was to ascertain that such stamps were affixed prior to mailing the policy to the insured's agent.

Because staples had been removed, and some pages were of a different weight and had different holes in Dal–Worth's copies, Mullens concluded Dal–Worth's copy was "not exactly what Skeels delivered to Shaffer." St. Paul, therefore, contends that because Mullens testified his standard operations called for such polices to be stamped, Dal–Worth's policies were stamped, and the copies had been tampered with. St. Paul also speculated the stamp could have been on the binder or the policy jacket which were not provided by Dal–Worth, and of which Mullens did not keep copies.

With this state of the evidence, reasonable minds could differ as to whether the policies contained the required language and, for that reason, the question was for the jury. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). Asked the question, the jury, privileged to believe or disbelieve any witness and to resolve the inconsistencies in the testimony, *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986), was entitled to refuse to find from the evidence and reasonable inferences

---

**12.** During the periods covered by the policies, the Texas Insurance Code provided that:

Every new or renewal insurance contract certificate, cover note or other confirmation of insurance procured and delivered as a surplus line coverage pursuant to this Article shall bear the name and address of the insurance agent who procured it and shall have stamped or affixed upon it the following: "This insurance

contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as a surplus line coverage pursuant to the Texas insurance statutes. Article 1.14–2, Texas Insurance Code, requires payment of 3.85 percent tax on gross premium." Tex.Ins.Code Ann. art. 1.14–2, § 7(a) (Vernon Supp.1987).

to be drawn therefrom that the policies contained the required language. Consequently, we are unable to say the jury's failure or refusal to find was against the great weight and preponderance of the evidence. St. Paul's thirty-fourth through -seventh points of error are overruled.

## ESTOPPEL AND WAIVER

As previously noticed, the jury, by its answers to questions numbers two and three, found that by its conduct, St. Paul was estopped from denying, and waived its right to assert, there was no coverage under the policies. The findings are attacked by St. Paul with its thirty-eighth through forty-first points of error, which are St. Paul's contentions that there is no or insufficient evidence to support the findings. The evidence is lacking, St. Paul argues, because the general rule is that estoppel or waiver will not afford coverage if there was no coverage under the policy, *Texas Farmers Ins. Co. v. McGuire,* 744 S.W.2d 601, 602–03 (Tex.1988), unless the insurer assumes a defense for the insured without a reservation of its rights to deny coverage. *State Farm Lloyds, Inc. v. Williams,* 791 S.W.2d 542, 550 (Tex.App.—Dallas 1990, writ denied).

 St. Paul contends the record contains no evidence of an exception to the general rule, because it never received notice of the Mission Butane lawsuit from Dal–Worth, it did not know about the lawsuit until it received notice of the default judgment, at which time it tendered a defense under reservation of rights, and, therefore, it had no duty to reserve its rights until notice of the lawsuit was received. From this, St. Paul draws two conclusions: First, there could be no estoppel shown because Dal–Worth was not prejudiced by any act of St. Paul, *Employers Cas. Co. v. Tilley,* 496 S.W.2d 552, 560 (Tex.1973); *Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 932 (1952), and Dal–Worth cannot show it suffered "clear and unmistakable harm" as required by the exception to the rule. *State Farm Lloyds, Inc. v. Williams,* 791 S.W.2d at 552–53; *Bell v. Moody,* 147 S.W.2d 852, 854–55 (Tex.Civ.App.—Texarkana 1941, writ dism'd judgm. cor.). Second, waiver was not

evinced because the record contains no evidence that it relinquished a known right, or that it acted intentionally and inconsistently with its knowledge with respect to the lawsuit. *State Farm Lloyds, Inc. v. Williams,* 791 S.W.2d at 552.

The difficulty with St. Paul's premise is that the jury found, on sufficient evidence, that it had knowledge of Mission Butane's lawsuit before the default judgment was taken. Shaffer, as St. Paul's agent, assured Talbot that St. Paul was "handling" the matter and, in reliance thereon, Dal–Worth did not hire an attorney to defend the lawsuit. During the thirteen months from the opening of the claim file in St. Paul's office, Talbot was assured that St. Paul was "investigating" the claim, and it was not until the default judgment was taken that St. Paul offered a defense with reservation of rights. Under these circumstances, the jury was entitled to consider that St. Paul, with knowledge through its agent Shaffer, assumed the defense of the lawsuit without any reservation of rights, and thereby waived all policy defenses, including that of noncoverage, and was estopped from raising them. *Id.* at 550.

The jury's findings of estoppel and waiver are reinforced by the expert testimony at trial, which was especially critical of St. Paul's failure to notify Dal–Worth of coverage problems until well after the default judgment was discovered. Even then, Asfeld told Talbot that St. Paul was analyzing the situation and would get back to him, but admittedly did not mention any concerns over coverage. Though Asfeld testified she told Talbot the DTPA claims might not be covered, she did not document that disclosure, and Talbot testified she "never" told him St. Paul might deny coverage. Talbot said he did not know of any problems with coverage until some five weeks later when the 10 January 1990 letter notified him of the denial of coverage.

 Under this evidence, the jury findings are consistent with the principle that when an insurer, such as St. Paul, has received the petition and citation in a suit filed against its insured, yet fails to provide a defense or notify the insured that coverage is being denied or the right to deny coverage is

being reserved, the insurer is estopped to deny coverage and is obliged to pay the default judgment rendered against its insured. *Miller's Mut. Fire Ins. Co. v. Alamo Exp. Inc.,* 548 S.W.2d 85, 88–89 (Tex.Civ. App.—Houston [1st Dist.] 1977, no writ); *and see Allstate Ins. Co. v. Pare,* 688 S.W.2d 680, 682–84 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.). St. Paul's thirty-eighth through forty-first points of error are overruled.

## DAMAGES

In connection with its submission of the questions of damages, the trial court instructed the jury that "the lost profits which are recoverable are 'net profits.' 'Net profits' is what remains in the conduct of a business or product line after deducting from its total receipts all of the expenses incurred in carrying on the business or product line." Reiterated, the jury, having found against St. Paul on liability issues—*i.e.,* that St. Paul's negligence was a proximate cause of damages to Dal–Worth, that St. Paul breached its duty of good faith and fair dealing owed to Dal–Worth, that St. Paul engaged in unfair or deceptive conduct, and that St. Paul engaged in an unconscionable action or course of action which was a producing cause of damages to Dal–Worth—found Dal–Worth had lost business profits in the past of $331,-750, would lose business profits in the future of $2,160,000, incurred increased business costs of $507,000, and suffered damage to its credit reputation in the amount of $500,000.

By its forty-second through -ninth points of error, St. Paul contends there was no or insufficient evidence to support the damages awarded to Dal–Worth, and, thus, the trial court erred in overruling its motion for judgment n.o.v., or alternatively, in failing to grant a remittitur. Specifically, St. Paul complains of the absence of or insufficient evidence in support of (42–43) the $2,160,000 awarded for future lost profits; (44–45) the $331,750 awarded for past lost profits; (46–47) the $507,000 awarded for increased business costs after the bankruptcy; and (48–49) the $500,000 awarded for damage to Dal–Worth's credit reputation.

## Definition of Net Profits

As a threshold matter, we first notice St. Paul's fiftieth point of error, its complaint that the trial court reversibly erred in not submitting the proper legal measure of damages for lost future profits. The error is said to have occurred when the court, in defining net profits, added the phrase "or product line" to the instruction, thereby broadening the meaning of net profits to encompass calculations that do not include all the income and all the costs of the business entity. St. Paul represents that it "brought the defect to the court's attention by way of a proper objection," but it does not direct us to any place in the record showing the objection, and we have failed to find it through our independent search.

Our search of the record did reveal that when St. Paul offered its objections to the court's charge, the only objection it voiced to the issue of future lost profits, other than a lack of evidentiary support, was that the "issue ... does not constitute a proper measure of damages. All future damages must be discounted to their present value. There is no testimony." Since the objection voiced at trial is not the same as the complaint presented on appeal, the appellate complaint was not preserved for review. Tex.R.App.P. 52(a); *Rogers v. Stell,* 835 S.W.2d 100, 101 (Tex.1992). St. Paul's fiftieth point of error is overruled.

## Future Lost Profits

St. Paul contends that while recovery for lost profits does not require an exact calculation, it nevertheless demands a significant degree of certainty, *Southwest Battery Corporation v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938), and the testimony presented by Talbot and Dal–Worth's expert, David Marshall, fell short of the standard to assist the jury in determining the amount of lost future profits with "reasonable certainty." *Frank B. Hall & Co. v. Beach, Inc.,* 733 S.W.2d 251, 258 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.). As a consequence, there is uncertainty which bars recovery. *Pederson v. Dillon,* 623 S.W.2d 696, 698 (Tex. Civ.App.—Houston [1st Dist.] 1981, no writ).

Underlying St. Paul's contentions of no and insufficient evidence to support the $2,160,000 awarded for future lost profits are three basic premises. They are: (1) The proper measure for recovery is net profits, and Dal–Worth presented evidence only of "marginal profit contribution"; (2) there was no evidence of the length of future operations or present value to accurately compute the damages; and (3) there was no deduction for future expenses.

■■■■ The correct measure of damages for loss of profits is net profits, which is defined as "what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business." *Turner v. PV Intern. Corp.,* 765 S.W.2d 455, 465 (Tex.App.—Dallas 1988), *writ denied per curiam,* 778 S.W.2d 865 (Tex.1989). In the calculation of net profits, allowance should be made for expenditures which the plaintiff would have been compelled to make, and also for the value of the plaintiff's time. *Copenhaver v. Berryman,* 602 S.W.2d 540, 544 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.).

■■■ As St. Paul recognizes, it is not necessary that profits should be susceptible of exact calculation. It is sufficient that there is data from which they may be ascertained with a reasonable degree of certainty and exactness. *Riddle v. Lanier,* 136 Tex. 130, 145 S.W.2d 1094 (1941); *Southwest Battery Corporation v. Owen,* 115 S.W.2d at 1099; *General Supply and Equipment Co., Inc. v. Phillips,* 490 S.W.2d 913 (Tex.Civ.App.—Tyler 1972, writ ref'd n.r.e.).

■■■ What constitutes reasonably certain evidence of lost profits is a fact intensive determination. Opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *Holt Atherton Industries, Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992).

■■■ If the business for which lost profits are sought is shown to be an ongoing business, then evidence that the business was established and making a profit at the time when the contract was breached or the tort was committed is admissible to show lost profits. *White v. Southwestern Bell Tel. Co. Inc.,* 651 S.W.2d 260, 262 (Tex.1983). In proving a claim of lost profits, if the business was not created by the contract in question then its profitability should be measured by the previous operation and profits earned, *Birge v. Toppers Menswear, Inc.,* 473 S.W.2d 79, 85 (Tex.Civ.App.—Dallas 1971, writ ref'd n.r.e.), and the normal increase in the business which might have been expected in the light of past developments and existing conditions may be considered. *Southwest Battery Corporation v. Owen,* 115 S.W.2d at 1099.

■■■ The difficulty of the review of the award of lost profits lies not in the statement of the rule, but the application of the correct rule to the record presented. Marshall testified that, based upon his calculations, Dal–Worth would suffer a loss of $216,000 per year, characterizing his calculations for the contribution of the LP line to Dal–Worth's profits as "marginal profit contribution." He explained this calculation was based upon the average of LP sales with a deduction for averaged direct costs, direct labor and certain allocated overhead items.

St. Paul takes exception to the methodology because it fails to deduct *"all* expenses included in conducting the business," and admittedly is not the same thing as net profits. However, Marshall's calculations of marginal profit contribution did take into account expenses incurred in the operation of the LP line and, as St. Paul's expert Lowell Goode testified, such calculation is in accordance with standard accounting principals.

Additionally, St. Paul complains of Dal–Worth's failure to present sufficient evidence of the length of the future of the LP line to support the recovery of future lost profits. The jury awarded Dal–Worth $2,160,000 for future lost profits, clearly multiplying the projected annual loss of $216,000 by ten. The only evidence Dal–Worth presented to show loss of profits in the future was Marshall's testimony that the loss would extend "over the next several years on the average," but he conceded he could not give "a set number of years."

"Several" is defined as "being of a number more than two or three, but not many; of an indefinitely small number." American Heritage Dictionary 1186 (1979). Consequently, the expression "several years," without more, is too indefinite to justify a finding that it means ten years, and no witness testified that Dal–Worth's future lost profits would amount to $2,160,000; therefore, there was no evidence to support the jury's finding of that amount. *Callejo v. Brazos Elec. Power Co-op,* 755 S.W.2d 73, 75 (Tex.1988). Once Dal–Worth chose the particular method for measuring its lost profits, it was required to provide a complete calculation. It did not do so and, as a result, the evidence was legally insufficient to provide a reasonable basis for determining its lost profits. *Holt Atherton Industries, Inc. v. Heine,* 835 S.W.2d at 85–86.

Conformably, St. Paul's forty-second no evidence point is sustained, and the sum of $2,160,000 must be deleted from the judgment. Resultantly, an address of its forty-third insufficient evidence point is pretermitted. Tex.R.App.P. 90(a).

### Past Lost Profits

St. Paul next complains, with its forty-fourth and -fifth points of error, of the legal and factual sufficiency of the evidence to support the jury's award of $331,750 for past lost profits. These complaints are considered under the standards of review for sufficiency of the evidence, and the principles governing lost profits, previously recited.

The record reveals that Talbot, designated as Secretary and Treasurer for Dal–Worth, also served as Director of Purchasing and Controller, and, having served Dal–Worth since 1973, had extensive knowledge of operations. His testimony was that as a going business, Dal–Worth, due to its volume and long-standing relationships, received substantial discounts of as much as 42% and generally paid on a 30–day net basis; but, when it became bankrupt, it lost most of its discounts, was required to pay many suppliers cash upon delivery, and some suppliers stopped selling to Dal–Worth. Although the custom and LP lines were not separated into net profits for each line prior to the closing of Dal–Worth as a going enterprise, the cost of doing business in the LP line increased dramatically.

Despite cost-cutting measures, Dal–Worth's cash was not sufficient to pay workers' compensation insurance premiums and, because it could not operate its LP line without the insurance, the LP line was discontinued. From invoices reflecting loss of favorable discounts and uncompleted orders, Talbot applied a "fairly close" 15% profit margin for the period, albeit he conceded it had not always been achieved, to reach the figure of $234,000 as lost profits in the past. At the close of business, Dal–Worth had an inventory of approximately $85,000 in excess parts for its LP line, which it was unable to sell, and applying the profit margin had the parts been incorporated into a propane vessel or tank, Talbot calculated a net loss on the inventory of $97,750. Combining the amounts of $234,000 and $97,750, Talbot arrived at the sum of $331,750 as lost profits in the past, the amount found by the jury.

Characterizing Talbot's methodology as rank speculation, St. Paul counters with the testimony of its expert Lowell Goode, a certified public accountant. Goode, who readily conceded that Dal–Worth had suffered damage because of its bankruptcy, calculated, from the data in Dal–Worth's books, that the damage to Dal–Worth was in the range of $51,000 to $187,000. Therefore, St. Paul submits, the difference in both the quality and quantity of the evidence presented illustrates the inadequacy of the record to support the jury's finding.

The evidence, viewed under the applicable standards of review, has probative force to support the jury's finding, and the evidence in support of the finding is not so weak, or the contrary evidence so overwhelming, that the finding should be set aside. The fact that the jury, as the judge of the credibility of the witnesses and the weight to be given their testimony, might have reached a different conclusion does not justify the setting aside of the determination it deemed the most reasonable under the conflicting evidence. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 797 (1951). St. Paul's forty-

fourth and -fifth points of error are overruled.

## Increased Business Costs

The jury's award of $507,000 to Dal–Worth for its increased business costs after the bankruptcy is attacked by St. Paul, with its forty-sixth and -seventh points of error, on the basis of no and insufficient evidence. The award is the sum of the amounts of extra costs testified to by Talbot for: (1) $50,000 paid to Mission in satisfaction of the default judgment; (2) $25,000 in attorneys' fees associated with the lawsuit; (3) $72,000 for increased purchase costs for the third quarter of 1990; (4) $34,000 for increased purchase costs for the fourth quarter of 1990; (5) $105,000 for increased purchase costs for fiscal year 1991; (6) $58,000 in loss of productivity; and (7) $135,000 for officers' and $28,000 for staff salaries for the 18 month period during which the officers and staff devoted their time to handling the bankruptcy rather than on production.

■ Items (1) and (2), for which St. Paul admits there is some supporting documentation, are expenditures resulting from the jury's finding of St. Paul's wrongful act, and are recoverable as damages. *Baja Energy, Inc. v. Ball,* 669 S.W.2d 836, 839 (Tex.App.—Eastland 1984, no writ). However, St. Paul maintains there is no underlying documentary support for the remaining amounts, and they are the subject of Talbot's estimations. Furthermore, St. Paul adds without supporting authority, increased business costs is an improper measure of damages and allows Dal–Worth a double recovery. It is St. Paul's position that the increased job costs are not a recoverable element of damage when past and future net profits are also recovered, that the expenses are nothing more than labor or overhead which are more properly factored into the net profit calculation, and that a remittitur, in the amount of its evidence of between $51,000 and $187,000 for past lost net profits, is in order.

■ Given the jury's determination that St. Paul's conduct was responsible for Dal–Worth's bankruptcy, Dal–Worth still owed St. Paul the duty to mitigate its damages, and was entitled to recover, as damages, the amount reasonably expended in the effort to do so. *Texas & P. Ry. Co. v. Mercer,* 127 Tex. 220, 90 S.W.2d 557, 560 (1936). Using figures taken from Dal–Worth's financial records, employing charts and graphs itemizing costs and sales, and evincing the resort to more expensive sources for parts and supplies upon the loss of favorable purchasing arrangements with suppliers, Talbot arrived at the figures for items (3), (4) and (5). He used daily work reports of hours spent on particular operations, and separated production from non-production time, to calculate the item (6) loss of productivity amount. Extensively testifying to the disruption of the daily business activities of the officers and staff in dealing with the unexpected bankruptcy, and applying a "conservative" calculation of the time necessitated by bankruptcy activities, Talbot arrived at the figure of item (7).

To the extent that St. Paul challenges the supporting documentation, any question concerning Talbot's methodology or the factual basis for his testimony goes to the weight and not the admissibility. *Holt Atherton Industries, Inc. v. Heine,* 835 S.W.2d at 84; *Pena v. Ludwig,* 766 S.W.2d 298, 304 (Tex. App.—Waco 1989, no writ). The jury, weighing the evidence, reached its finding upon evidence sufficient to support the finding. St. Paul's forty-sixth and -seventh points of error are overruled.

## Credit Reputation

Additionally, St. Paul contends there was a lack of sufficient evidence to support the jury's award of $500,000 for damage to Dal–Worth's credit reputation. Application of the standards of review previously outlined requires our disagreement.

Prior to filing for bankruptcy relief, Dal–Worth had been in business for over forty years and had, as a rule, paid its accounts early and received discounts on its purchases. Although Dal–Worth admittedly had never borrowed, nor attempted to borrow, money from a bank, it had, according to Talbot, a credit line of $2 million with Mercantile Bank before the bankruptcy. At that time, a prospective purchaser assessed the

borrowing power of Dal–Worth at $2,750,000, a figure Talbot verified with the bank.

After filing bankruptcy, Dal–Worth noticed an appreciable change in the way people did business with the company. Talbot testified that most of the vendors and creditors closed Dal–Worth's open accounts, no longer extended credit terms and discounts, and often required payment in cash. The company experienced a serious cash flow problem, and Talbot assessed Dal–Worth's current borrowing power at the time of trial at $250,000.

St. Paul relies upon Goode's testimony that any loss of credit reputation was subsumed within its other damage figures, and the fact that Dal–Worth had never attempted to borrow money from a bank, to show there was no evidence of a loss of credit reputation. Such evidence serves only to contradict Talbot's testimony of damage, not to eradicate it; the worth of the evidence is for the jury's determination. *Benoit v. Wilson,* 239 S.W.2d at 797.

 Loss of credit reputation is a proper measure of damages which may be recovered when the loss is the natural, probable, and foreseeable consequence of the defendant's conduct. *Mead v. Johnson Group, Inc.,* 615 S.W.2d 685, 687 (Tex.1981). Talbot testified that Dal–Worth's decision to file for bankruptcy relief was the result of the inability to keep the business going in light of the default judgment it suffered as the result of St. Paul's failure to defend it. The testimony is sufficient evidence that the loss of Dal–Worth's credit reputation was a natural, probable, and foreseeable consequence of St. Paul's action, and the evidence was sufficient to support the jury's award of damages. St. Paul's forty-eighth and -ninth points of error are overruled.

Next, St. Paul challenges, with its fifty-first and -second points of error, the award of attorney's fees to Dal–Worth, and, with its fifty-third point, the award of prejudgment interest. Because our sustainment of St. Paul's forty-second point of error requires the deletion of the award of $2,160,000 for lost future profits from the judgment and the recalculation of punitive damages, the amount of attorney's fees and prejudgment interest must be recalculated; consequently, we will address only the principles pertaining to the awards of attorney's fees and prejudgment interest and not the amounts thereof.

### Attorney's Fees

St. Paul has couched its challenge to the attorney's fees as no and insufficient evidence to support the jury's answer to question 17 that Dal–Worth was entitled to 40% of Dal–Worth's recovery as reasonable attorney's fees. These points were preserved by St. Paul's inclusion of its evidential challenges in its motion for new trial. *Cecil v. Smith,* 804 S.W.2d 509, 512 (Tex.1991); Tex. R.Civ.P. 324(b)(2–3).

Initially, St. Paul, recognizing that the award of attorney's fees was based on article 21.21, section 16(b), of the Insurance Code, represents that Dal–Worth's only theory for recovery of attorney's fees was under section 38.001(8), Texas Practice & Remedies Code Annotated (Vernon 1986), on its claim for breach of contract. However, St. Paul did not object to question 17 for this reason. Dal–Worth pleaded that St. Paul's conduct was actionable pursuant to the Insurance Code's article 21.21, section 16 and the DTPA's section 17.50(d), both of which specifically provide for the recovery of reasonable and necessary attorney's fees. Absent special exceptions to the pleading in this regard, the petition will be liberally construed in favor of Dal–Worth. *Raw Hide Oil & Gas, Inc. v. Maxus Explor. Co.,* 766 S.W.2d 264, 270 (Tex.App.—Amarillo 1988, writ denied). Moreover, in objecting to the attorney's fee question, St. Paul argued for its restriction to damages awarded for the Insurance Code and DTPA violations.

Secondly, St. Paul takes issue with the calculation of the amount of attorney's fees, insisting that by application of the 40% "of Dal–Worth's recover[y]" found by the jury to be a reasonable and necessary fee, the court awarded a 66% fee. Suffice it to state that pursuant to the jury's answer to question 17 as it was worded, Dal–Worth was entitled to 40% of the sum of its actual damages, prejudgment interest thereon, and statutory trebling of the actual damages. *Great American Insurance Company v. North Austin*

*Municipal Utility District No. 1,* 908 S.W.2d 415, 426 (1995). To the extent that there must be a recalculation of the attorney's fees because of the recomputation of damages, St. Paul's fifty-first and -second points of error are sustained; otherwise, they are overruled.

## PREJUDGMENT INTEREST

St. Paul uses its fifty-third point of error to contend the award of prejudgment interest was made in error. This is so, St. Paul submits, because (1) the award was made under the holding of *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex. 1985), rather than Texas Revised Civil Statute Annotated article 5069–1.05, section 6 (Vernon Supp.1995); and (2) trebling of prejudgment interest was improper.

 Again, because the deletion of the award of $2,160,000 from the judgment, and the resulting recomputation of damages, necessitates the recalculation of prejudgment interest, a sufficient address of the point is that application of article 5069–1.05, section 6, *supra,* is limited to "[j]udgments in wrongful death, personal injury, and property damage cases," none of which are involved in this litigation, and that prejudgment interest is to be calculated under the holding of *Cavnar. Spangler v. Jones,* 861 S.W.2d 392, 398–99 (Tex.App.—Dallas 1993, writ denied). The application of the *Cavnar* holding requires that prejudgment interest be calculated on the amount of actual damages, not on the punitive damages authorized by the Insurance Code. *Vail v. Texas Farm Bureau Mut. Ins. Co.,* 754 S.W.2d at 137; *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d at 555. With this explanation, St. Paul's fifty-third point of error is overruled.

## SETTLEMENT CREDIT

As earlier recorded, Dal–Worth and Mission Butane agreed to settle the controversy with Shaffer by its payment of $498,895.50, which was to be returned if the action against St. Paul was successful. In rendering judgment, the trial court did not grant St. Paul credit for the Shaffer settlement,

which, so St. Paul asserts with its fifty-fourth and final point, was error. Because the comparative responsibility statute does not apply to this litigation,[13] St. Paul argues common law principles apply and mandate that it be credited with the $498,895.50 amount under the common law rule of "one satisfaction" espoused in *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 5 (Tex.1991).

 The one satisfaction rule applies to prevent a plaintiff from obtaining more than one recovery for the same injury. *Id.* at 7. However, to achieve only one recovery, the rule does not prevent the imposition of liability upon a tortfeasor by the percentage of causation assigned to the tortfeasor as determined by the jury. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d at 432. In this cause, the jury found that St. Paul was liable for 100% of Dal–Worth's damages, and St. Paul has not challenged the finding. And Dal–Worth has not achieved more than it was entitled to recover, for under the settlement agreement with Shaffer, Dal–Worth is obligated to return the money Shaffer paid. St. Paul's final point of error is overruled.

## DISPOSITION

Accordingly, the judgment is reversed only to the extent that it awards Dal–Worth recovery for future lost profits, which requires a recomputation of damages, actual and trebling, and the cause is remanded to the trial court in order that prejudgment interest and attorney's fees may be computed in conformity with the applicable principles expressed in this opinion. *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d at 556. Of the costs occasioned by this appeal, 52% are taxed against St. Paul and 48% are taxed against Dal–Worth and Mission Butane, jointly and severally. Tex.R.App.P. 89.

## *ON MOTIONS FOR REHEARING*

All parties to this appeal have moved for a rehearing. Although we remain convinced that our original disposition is correct, we need to further address the differing interpretations St. Paul and Dal–Worth have giv-

---

**13.** The statute "does not apply to ... an action brought under Chapter 21, Insurance Code."

Tex.Civ.Prac. & Rem.Code § 33.002(b)(3) (Vernon Supp.1995).

en to our treatment of the trial court's award of prejudgment interest.

 The trial court computed prejudgment interest under the holding of *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985), and trebled the amount as an element of Dal–Worth's actual damages. St. Paul used its fifty-third point of error to contend the trial court erred in awarding prejudgment interest under the holding of *Cavnar*, and in trebling the prejudgment interest. In disposing of St. Paul's contentions, we held that *Cavnar* required prejudgment interest to be calculated on the amount of actual damages, not on the punitive damages authorized by the Insurance Code, and with that explanation, we overruled the point of error.

St. Paul asserts that it interprets our opinion as agreeing that prejudgment interest may not be trebled because to do so erroneously permits interest on punitive damages; but, if not, we should so hold. Noticing that we did not state that the trial court erred by trebling prejudgment interest, sustain St. Paul's point of error, or reverse, in part, on the interest issue, Dal–Worth and Mission Butane respond by stating that we should clearly hold that prejudgment interest is an element of actual damages subject to trebling under the Code and affirm the portion of the judgment trebling prejudgment interest.

By approving the trial court's calculation of prejudgment interest on actual, but not punitive, damages under the *Cavnar* holding and overruling the point of error, we necessarily overruled St. Paul's contention that the trial court erred in trebling the prejudgment interest. *See, e.g., Celtic Life Ins. Co. v. Coats*, 831 S.W.2d 592, 598–99 (Tex.App.—Austin 1992), *modified on another ground*, 885 S.W.2d 96 (Tex.1994). Consequently, we did not disturb the trial court's methodology. However, because we held that the sum of $2,160,000 was erroneously awarded for future lost profits, an element of actual damages, and must be deleted from the judgment, the deletion required a recalculation of the correct amount of prejudgment interest on the reduced amount of actual damages and attorney's fees. Therefore, we could not affirm the portion of the judgment trebling prejudgment interest in an incorrect amount; instead, we could, and did, reverse the judgment only to the extent that it awarded Dal–Worth recovery for future lost profits, and remanded the cause for the recomputation of prejudgment interest and attorney's fees.

Remaining convinced that our original disposition of the appeal was correct, we overrule all motions for rehearing.